Opinion
 

 JONES, J.
 

 United Public Employees, Local 790 (Local 790) appeals from the denial of its petition to compel the City and County of San Francisco (the City) to arbitrate a grievance pursuant to the governing collective bargaining agreement (the agreement). By this petition, Local 790 sought to arbitrate a grievance concerning the random selection of one of its members, David Turner, Jr. (Turner), a car cleaner for the City’s Municipal Railway (MUNI), for drug testing. After an independent review of the agreement, we concur with the trial court’s conclusion that this dispute was not subject to arbitration.
 

 We base our resolution of this appeal on the preemptive effect of the Omnibus Transportation Employee Testing Act of 1991 (Pub.L. No. 102-143
 
 *1024
 
 (Oct. 28, 1991) tit. V, 105 Stat. 952 (the Omnibus Act)),
 
 [1]
 
 which requires drug and alcohol testing of employees who are required to perform “safety-sensitive” functions in the transportation industry. Federal regulations issued under the Omnibus Act state that employees whose jobs include the operation of transit vehicles are “safety-sensitive” employees who must be subject to testing. Turner was notified that his job classification, transit car cleaner, was included in the list of safety-sensitive positions because transit car cleaners are called upon at various times to drive transit vehicles within the yard. However, once Turner was randomly selected for testing, he sought to arbitrate whether or not he had been properly classified as a safety-sensitive employee because, to date, he had never been called upon to drive a vehicle.
 

 The City has provided us with unrefuted evidence that Turner could be reassigned at any time to a position which includes driving transit vehicles. We have also been directed to federal authority indicating that the
 
 possibility
 
 that Turner might be called upon to perform a safety-sensitive function is enough to satisfy the regulatory definition. We conclude that allowing an arbitrator to exempt this employee in a job classification properly designated as safety-sensitive from drug testing would conflict with the express provisions of federal law and with the San Francisco City Charter, which exempts “the classification and reclassification of positions and the allocation and reallocation of positions to the various classifications” from the scope of bargaining and relegates it to the exclusive jurisdiction of the civil service commission. (S.F. Charter, § A8.409-3.) Consequently, we affirm.
 

 Facts
 

 Local 790 is an employee organization which represents certain classified employees for the City for purposes of bargaining pursuant to the MeyersMilias-Brown Act. (Gov. Code, § 3500 et seq.) Local 790 and the City are parties to an agreement concerning wages, hours, and working conditions of employees. Pursuant to the agreement, the parties have agreed to submit disputes which involve “the interpretation or application of, or compliance with this agreement” to a grievance procedure which, under specified circumstances, can include binding arbitration.
 

 The controversy between the parties stems from the June 27, 1995, random drug testing of MUNI employee Turner, a class 9102 transit car cleaner. Local 790, the bargaining representative for Turner’s classification,
 
 *1025
 
 filed a formal grievance on July 7, 1995, contending that the City violated the agreement because Turner “was subjected to Drug/Alcohol Testing.” The grievance goes on to state “Mr. Turner is not a Safety Sensitive Worker. He does not drive an automobile—let alone a MUNI bus. He does not even have a driver’s license. This is and has been known by the [San Francisco Municipal Railway] for his entire tenure in S.F. City employment. It has never been a required function of his position.” Local 790 requested the City to immediately remove Turner from the “Substance Testing Pool” and reclassify him “as Non-Safety Sensitive as he is in fact.”
 

 After the City refused to submit the dispute to arbitration, Local 790 filed a petition to compel arbitration (Code Civ. Proc., § 1281.2), from which this appeal arises. The petition defines the issue to be arbitrated as whether the City violated the agreement by subjecting Turner to “disciplinary and discriminatory drug testing.” The petition prays for an order directing the City to submit the dispute to arbitration as provided by the agreement.
 

 The City’s answer sets forth the affirmative defense, among others, that the claim presented was preempted by federal law, particularly the Omnibus Act. The Omnibus Act was enacted to enhance transportation safety and to guard against the demonstrated dangers of drug and alcohol abuse through drug and alcohol testing, including mandatory random testing of safety-sensitive employees who are involved in the transportation industry. (49 U.S.C. § 5331(b).)
 

 The parties’ respective viewpoints were presented to the court through points and authorities and oral argument. In denying Local 790’s petition to compel arbitration, the trial court remarked that it disagreed with Local 790’s position that this grievance “involves disciplinary proceedings or involves any of the other interpretations of contract. And indeed, I don’t perceive that the contract even begins to speak to the question of who is properly classified as a safety sensitive employee.” On April 18, 1996, Local 790 filed a notice of appeal from this ruling.
 
 [2]
 

 Overview
 

 Code of Civil Procedure section 1281.2 specifically states that we must order an arbitration of a dispute “if it determines that an agreement to arbitrate the controversy exists . . . .’’It goes on to provide, “[i]f the court
 
 *1026
 
 determines that a written agreement to arbitrate a controversy exists, an order to arbitrate such controversy may not be refused on the ground that the petitioner’s contentions lack substantive merit.” In determining whether there is an obligation to arbitrate this particular dispute, we must examine and, to a limited extent, construe the underlying agreement.
 
 (Freeman
 
 v.
 
 State Farm Mut. Auto. Ins. Co.
 
 (1975) 14 Cal.3d 473, 480 [121 Cal.Rptr. 477, 535 P.2d 341];
 
 United Transportation Union
 
 v.
 
 Southern Cal. Rapid Transit Dist.
 
 (1992) 7 Cal.App.4th 804, 808 [9 Cal.Rptr.2d 702].)
 

 The question of whether a collective bargaining agreement creates a duty for the parties to arbitrate a particular grievance is an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator. The court also determines what issues are subject to arbitration.
 
 (Engineers & Architects Assn.
 
 v.
 
 Community Development Dept.
 
 (1994) 30 Cal.App.4th 644, 652-653 [35 Cal.Rptr.2d 800].) “ ‘Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration. The court should order them to arbitrate unless it is clear that the arbitration clause cannot be interpreted to cover the dispute. [Citation.]’”
 
 (Ibid.)
 
 However, there is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate.
 
 (Los Angeles Police Protective League
 
 v.
 
 City of Los Angeles
 
 (1988) 206 Cal.App.3d 511, 514 [253 Cal.Rptr. 641].)
 

 The right to arbitration depends upon the terms of the contract—a petition to compel arbitration is simply a suit in equity seeking specific performance of that contract.
 
 (Fontana Teachers Assn.
 
 v.
 
 Fontana United School Dist.
 
 (1988) 201 Cal.App.3d 1517, 1521 [247 Cal.Rptr. 761];
 
 Brock
 
 v.
 
 Kaiser Foundation Hospitals
 
 (1992) 10 Cal.App.4th 1790, 1795 [13 Cal.Rptr.2d 678].) Where, as here, the agreement is interpreted based on undisputed evidence, we are not bound by the trial court’s construction of the agreement. Instead, in such a case, the interpretation of the agreement becomes a question of law and we must make an independent determination of its meaning.
 
 (Service Employees Internat. Union
 
 v.
 
 City of Los Angeles
 
 (1996) 42 Cal.App.4th 1546, 1552-1553 [50 Cal.Rptr.2d 216];
 
 Vianna
 
 v.
 
 Doctors’ Management Co.
 
 (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188];
 
 Valsan Partners Limited Partnership
 
 v.
 
 Calcor Space Facility, Inc.
 
 (1994) 25 Cal.App.4th 809, 817 [30 Cal.Rptr.2d 785].)
 

 Discussion
 

 As already noted, the Omnibus Act requires random alcohol and drug testing for transportation workers in “safety-sensitive” positions. The
 
 *1027
 
 preemption provision of the Omnibus Act confirms that its purpose was to nullify state laws that might prevent local transit systems from conducting drug and alcohol testing of their safety-sensitive employees. Among other things, the Omnibus Act prohibits any state or local government from adopting or having in effect “law, regulation, standard, or order that is inconsistent with the regulations prescribed under this section.” (49 U.S.C. § 5331(f).) The implementing regulations for the Omnibus Act preempt any state and local laws to the extent that (1) compliance with both the state and local law and the federal regulations is not possible, or (2) compliance with the state or local law “is an obstacle to the accomplishment and execution of any requirement in this part.” (49 C.F.R §§ 653.9, 654.9 (1995).)
 

 The Omnibus Act requires recipients of federal transit funds to implement a program to deter and detect the use of prohibited drugs and alcohol by covered employees who perform “safety-sensitive functions.” (49 C.F.R §§ 653.3, 654.1 (1995).) “Safety-sensitive” functions are defined by a characterization of duties performed instead of listing specific job titles. The regulations list five categories of safety-sensitive functions, including “Operating a revenue service vehicle [e.g., bus trolley, light-rail vehicle, cable car], including when not in revenue service.” (49 C.F.R §§ 653.7, 654.7 (1995).) Thus, “. . . an employee who operates a revenue service vehicle for any purpose whatsoever is a safety-sensitive employee and is subject to the rule.” (59 Fed.Reg. 7584 (Feb. 15, 1994).)
 

 With respect to random testing, the regulations require that 50 percent of the safety-sensitive pool of employees be tested each year for controlled substances and 25 percent of the pool be tested each year for alcohol. (49 C.F.R §§ 653.47, 654.35 (1995)) No employee who has tested positive for a prohibited drug or for alcohol may remain in his or her safety-sensitive function. (49 C.F.R §§ 653.35, 654.21 (1995).) Nor may an employee refuse to submit to a required test for alcohol or controlled substances. A refusal is treated as a positive test, prohibiting an individual from performing his or her safety-sensitive functions. (49 C.F.R §§ 653.35, 654.29 (1995).)
 

 The federal regulations require that an employer designate the categories of safety-sensitive employees in the policy statement adopted by its governing board. (49 C.F.R §§ 653.25(b), 654.71(b)(2) (1995).) The regulations impose an obligation on employers to provide educational materials to employees designated as safety-sensitive, explaining the requirements of the regulations as well as the employer’s policies and procedures with respect to meeting the requirements. (49 C.F.R §§ 653.25(a), 654.71(a) (1995).)
 

 The City met its obligation under the regulations by designating a list of job classifications as safety-sensitive, thereby subjecting employees in those
 
 *1028
 
 classifications to federal drug testing requirements. Turner’s classification, class 9102 (transit car cleaner) is on the list. It was explained below that transit car cleaners are included in the list of safety-sensitive positions because they are required at various times to drive transit vehicles. The exam announcement for transit car cleaners clearly states that they may be required “to operate a transit vehicle” and their duties potentially include “driving the vehicle through the washrack or elsewhere, usually in the yard . . . .” The list of safety-sensitive employees was made a part of MUNI’s formal substance abuse policy which was approved by the Public Transportation Commission in December 1994.
 

 Concurrent with the adoption of regulations implementing the Omnibus Act, the Department of Transportation (DOT) published in the Federal Register a document entitled “Limitation on Alcohol Use by Transportation Workers.” (59 Fed.Reg. 7301-38 (Feb. 15, 1994).) This document was intended to be a “common preamble” to the testing regulations. With respect to an employer’s right to engage in federally mandated drug testing in the face of collective bargaining, the common preamble states: “Some commenters asked us to preserve their right to collectively bargain certain testing requirements. The rules contemplate that many aspects of the employer/ employee relationship with respect to these programs will be subject to collective bargaining. For example, who pays for assessment and evaluation is one area we explicitly do not regulate. However, employers and employees are not free to bargain away any of the requirements of these rules. Whatever rights they may have to bargain collectively or otherwise agree on employer-employee relations, they cannot change or ignore Federal safety standards.” (59 Fed.Reg. 7301, 7317 (Feb. 15, 1994).)
 

 Consistent with this scheme, bargaining representatives of safety-sensitive employees, including Local 790, negotiated with MUNI management and agreed to several memoranda of understanding (MOU’s) governing certain nonmandatory and discretionary aspects of the City’s substance abuse testing program, such as discipline and rehabilitation. The City notified Turner that his job classification was designated safety-sensitive and subject to random drug testing on February 15, 1995.
 

 Given this legislative backdrop, Local 790 wisely does not take issue with the proposition that federal law mandates that the City promulgate a drug and alcohol testing program regulating its employees who are assigned to safety-sensitive positions. Local 790 does not quarrel with the proposition that the Omnibus Act’s regulations clearly and preemptively require MUNI to test all employees who actually perform safety-sensitive functions. Nevertheless Local 790 seeks to take the propriety of Turner’s testing outside the
 
 *1029
 
 federal regulatory mandate and move it squarely within the terms of the collective bargaining agreement, based on Local 790’s assertion that Turner never performs safety-sensitive work. Local 790 questions how Turner, who has no driver’s license, who never drives the vehicles, who never maintains the vehicles in any way, and who only gets on and off the vehicles to wash them and clean them, is somehow in a safety-sensitive position, despite the fact that he does not operate or maintain these vehicles. Hence, Local 790 maintains that whether or not Turner has been properly classified as a safety-sensitive employee was a mandatory subject for arbitration under the governing agreement.
 

 In evaluating this argument, it is important to keep in mind that the City has not unilaterally implemented a drug-testing program without negotiating the nonpreemptive discretionary aspects of the program. (Cf.
 
 Holliday
 
 v.
 
 City of Modesto
 
 (1991) 229 Cal.App.3d 528, 540 [280 Cal.Rptr. 206].) Indeed, the City negotiated with Local 790, as well as other bargaining representatives for safety-sensitive classifications, and entered into several MOU’s over the terms of the City’s substance abuse program. Significantly, the MOU’s do not contain any jointly negotiated agreement to arbitrate the designation of an individual as a safety-sensitive employee or to arbitrate the designation of certain job classifications as safety-sensitive. It is somewhat disingenuous for Local 790, who helped negotiate employees’ rights under the City’s drug testing policy, to now argue that it has the right to arbitrate the City’s ability to apply that policy to employees in safety-sensitive job classifications on an employee-by-employee basis under a separate agreement covering wages, hours and conditions of employment.
 

 Having said this, we turn to Local 790’s argument that even if arbitration of any challenge to the City’s right to implement a drug and alcohol testing policy is preempted, the City was not preempted from arbitrating the applicability of the safety-sensitive designation to Turner’s assigned duties. The short answer to this argument is that the way the City chose to implement its federally-mandated testing policy cannot be so easily divorced from the federal legislation that prompted it.
 

 jn addressing the key factual issues relating to Local 790’s assertion that the arbitrable issue is whether the City “erroneously imput[ed] to Turner, on the basis of his job title, safety-sensitive duties,” the City
 
 *1030
 
 submitted the affidavit of the general superintendent of MUNI’s maintenance administration.
 
 [3]
 
 The affidavit explains: “[c]ar cleaners are assigned to the Diesel Division, the Cable Car Bam, Green Light Rail Vehicle Maintenance Center, the Trolley Coach Division, and the Non-revenue Division. No California Driver’s license is required to drive light rail vehicles, cable cars, or trolley coaches within the yard and shop area. Some car cleaners drive transit vehicles daily. Others may drive intermittently. Still others may not be required to drive at a particular location. However,
 
 at any time during the year, with short notice, management may reassign a car cleaner to duties which include driving transit vehicles
 
 .... There is no sign-up by car cleaners for particular work locations. For this reason, MUNI management determined that the entire class of car cleaners should be included in the safety-sensitive pool.” (Italics added.) These factual allegations were never refuted by Turner or Local 790.
 

 Moreover, the City has provided an unrefuted opinion letter from the DOT’s Federal Transit Administration that “[i]f a job description
 
 includes the possibility of performing a safety-sensitive function, then the person in that job is subject to
 
 testing” even if he or she performs that function only on rare occasions, such as during a strike. (Italics added.) Therefore, regardless of the duties actually performed by Turner, the possibility that he
 
 might
 
 be called upon to perform safety-sensitive functions is enough to satisfy the federal regulatory definition. Turner thus falls squarely within the federal definition of a safety-sensitive employee and, as such, he must submit to all dmg and alcohol testing required by the Omnibus Act. In conclusion, the question as to whether the City’s dmg testing requirements apply to Turner is not up for decision by an arbitrator. It is governed by federal law which is preemptive.
 

 Throughout this appeal, Local 790 has attempted to reframe Turner’s grievance as implicating provisions in the agreement regarding working conditions, discipline, privacy and discrimination. In this case, a simple review of the agreement shows that the instant dispute regarding whether Turner has been properly classified as safety-sensitive subject to federally required dmg testing is outside the scope and terms of the agreement. In fact, to allow an arbitrator to exempt an employee in a job classification properly designated as safety-sensitive from dmg testing would conflict not only with
 
 *1031
 
 express provisions of the federal law but would seemingly conflict with the San Francisco City Charter, which exempts “the classification and reclassification of positions and the allocation and reallocation of positions to the various classifications” from the scope of bargaining and relegates them to the exclusive jurisdiction of the civil service commission. (S.F. Charter, § A8.409-3.)
 

 Given the state of the federal Omnibus Act and its implementing regulations and the recognition that the City’s classification of positions is specifically carved out from the scope of bargaining, we agree with the trial court’s determination that the governing agreement did not contemplate arbitration over Turner’s submission to federally mandated random drug testing. While there is “a strong policy in favor of enforcing agreements to arbitrate, . . . there is no policy compelling persons to accept arbitration of controversies which [as here] they have not agreed to arbitrate . . . .”
 
 (Freeman
 
 v.
 
 State Farm Mut. Auto. Ins. Co., supra,
 
 14 Cal.3d at p. 481.)
 

 The judgment denying the petition to compel arbitration is affirmed.
 

 Peterson, P. J., and Haning, J., concurred.
 

 [1]
 

 The pertinent provisions of the Omnibus Act were originally codified at 49 United States Code section 1618a but were substantially recodified at 49 United States Code section 5331 in a comprehensive though unsubstantive restructuring of title 49 which occurred in 1994. (See Pub.L. No. 103-272 (July 5, 1994) 108 Stat. 745.)
 

 [2]
 

 An order denying a petition to compel arbitration is appealable. (Code Civ. Proc., § 1294, subd. (a);
 
 Boys Club of San Fernando Valley, Inc.
 
 v.
 
 Fidelity & Deposit Co.
 
 (1992) 6 Cal.App.4th 1266, 1270, fn. 1 [8 Cal.Rptr.2d 587].)
 

 [3]
 

 “In ruling on a petition to compel arbitration, the trial court may consider evidence on factual issues relating to the threshold issue of arbitrability, i.e., whether, under the facts before the court, the contract excludes the dispute from its arbitration clause or includes the issue within that clause. [Citations.] Parties may submit declarations when factual issues are tendered with a motion to compel arbitration. [Citation.]”
 
 (Engineers & Architects Assn.
 
 v.
 
 Community Development Dept., supra,
 
 30 Cal.App.4th at p. 653.)