[No. A112099. First Dist., Div. Two. Feb. 21, 2007.]

JULIA BONO, Plaintiff and Respondent, v.
ELICIA W. DAVID, Defendant and Appellant.

**COUNSEL**

Miller, Starr & Regalia and Lewis J. Soffer for Defendant and Appellant.

Julia Bono, in pro. per., for Plaintiff and Respondent.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Julia Bono and Elicia W. David were two of several parties to a memorandum of understanding (MOU) that contained a clause requiring mediation and arbitration of "[a]ny controversy among the parties involving the construction or application of any provision of this Agreement . . . ." The MOU was executed in 2000 by several tenants in common of Lake County property the group planned to develop. In 2005, respondent Bono brought an action for defamation against appellant David based on the contents of a 2004 e-mail David sent to a third party who was apparently attempting to resolve disputes

between those two individuals concerning details of the development. David moved to compel mediation and arbitration of Bono's defamation action pursuant to the arbitration provision of the MOU and Code of Civil Procedure section 1281.2 (section 1281.2). The trial court denied the motion, ruling that Bono's defamation action was essentially "a stand-alone action" that did not involve contractual interpretation. We agree and hence affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In March 2000, the two parties to this lawsuit, plus several others, took title as tenants in common to some 920 acres of unimproved real property near Middletown in Lake County. Both parties to this action received a 12.5 percent interest in the property.[1] The other tenants in common were and are: Brian and Laura Behlendorf, husband and wife, who received a 62.5 percent interest as joint tenants, and Chris and Stephanie Dolan, also husband and wife, who received a 12.5 percent interest as joint tenants.

On March 4, 2000, six days before the deed conveying the property was recorded, the several grantees executed the MOU. The text of the MOU consumed only two pages; appended to it were signature pages, which also designated the amount of cash to be contributed by each of the parties to the purchase price of the property and an exhibit showing a map of the property.

The MOU contemplated that a parcel composing the larger part of the 920 acres would be retransferred to the Behlendorfs in consideration of their substantial monetary contribution toward the original purchase, but with a right of first refusal in an entity to be created by the other original owners to repurchase that portion of the property, and with agreements to both allow rights of passage over that portion of the property and to lease portions of it for "the development of community projects." The remaining 280 acres were to be transferred to a limited partnership to be known as "Eleusis L.P." of which David, Bono (then Carter) and Chris Dolan "shall be the limited partners." The MOU contemplated that this entity or a successor to it "shall be the structure for development of a greater community on this parcel of land."

One of the substantive provisions of the MOU was a clause reading, in pertinent part: "Arbitration. *Any controversy among the parties involving the construction or application of any provision of this Agreement* shall be

---

[1] Respondent Bono was then identified as "Julia Carter, an unmarried woman." Her name later changed to Julia Bono.

submitted first to non-binding mediation of a disinterested third-party chosen by a two thirds majority of the parties hereto . . . . [I]f the written determination of said mediator is unacceptable to any one of the parties involved, said grievance shall be subject to binding arbitration in San Francisco, California. Any such arbitration shall comply with and be governed under the provisions of the Rules of the American Arbitration Association. All parties agree to be bound by the final findings and determinations of the chosen arbitrator." (Italics added.)

By March 2004, a number of disagreements had developed among the tenants in common. Via some process or another (the record is not clear on this), an individual named Richard Van Donk of Middletown had been designated to try to iron out disagreements between Bono and David regarding various aspects of what was known to the owners of the property as the "Eleusis Project."[2] In the course of these efforts, David sent Van Donk an e-mail which contained various aspersions on Bono's emotional stability.

In any event, Van Donk's settlement efforts regarding various aspects of the project apparently failed, because in the ensuing months three lawsuits were filed amongst the parties to the "greater community" project. More specifically, in April 2004, the several other grantees filed an action against Bono for partition of the property and an accounting in the Lake County Superior Court (hereafter partition action). The following month, May 2004, Bono sued the Behlendorfs for a personal injury she allegedly suffered in May 2002 while hiking on that portion of the property which might later revert to their sole ownership (hereafter personal injury action). And in July 2004, Bono and an entity known as Eleusis Management, L.L.C., filed a declaratory relief action against the other tenants in common seeking a declaration as to "plaintiffs' and defendants' respective rights and duties under the" MOU (hereafter declaratory relief action).

In her answer to the partition action, Bono—appearing in propria persona, as she is here—alleged that the MOU constituted an agreement that effectively foreclosed such an action and thereafter moved to compel mediation and, if necessary, arbitration pursuant to the MOU clause quoted above. The plaintiffs in the partition action, i.e., the other tenants in common,

---

[2] Van Donk is described in some of the pleadings before us as a "master," but at oral argument it was explained that he is a "master of martial arts," not a professional mediator, and also not an attorney. Bono alternatively described him, at oral argument, as an "advocate" for her and a "go between" between her and David. In any event, neither party suggests that Van Donk had been formally appointed as a mediator pursuant to the two-thirds vote requirement of the MOU clause in question.

accepted this demand; in so doing, they also moved for a stay of the partition action, a continuance of a hearing on Bono's motion, and even nominated a potential mediator.

The trial court declined to grant the continuance requested by the defendants in the partition action and, instead, held the hearing on the scheduled date of August 3, 2004. On September 2, 2004, it issued an order staying the partition action and ordering it submitted for mediation and, failing that, arbitration. In so doing, it framed its order somewhat differently than the language of the MOU; its order read, in pertinent part: "[T]he disputes and disagreements among the parties to this action shall be determined by the following procedure: [¶] *Any controversy among the parties* shall be submitted first to non-binding mediation . . ." and then continued along the same lines as the wording in the MOU. (Italics added.) Two month later, in November 2004, the trial court granted the other tenants in common's motion to consolidate the partition action and the declaratory relief action and to compel arbitration of the consolidated action. A formal order to that effect was entered on December 3, 2004. After the court was advised that mediation efforts were unsuccessful, on March 28, 2005, it ordered the consolidated action to arbitration.

Meanwhile, the personal injury action filed by Bono against the Behlendorfs in May 2004 was challenged by a demurrer of the two defendants on December 23, 2004. That demurrer was sustained on February 14, 2005. On February 25, 2005, Bono filed an amended complaint alleging the same injury albeit on a different legal theory. The defendants demurred to that complaint, also, and this demurrer was likewise sustained—again with leave to amend—on April 25, 2005. A demurrer to Bono's second amended personal injury complaint was also sustained on July 25, 2005, albeit this time without leave to amend.

While all this was going on, on February 28, 2005, Bono filed—still in propria persona—the defamation complaint that is at the core of this appeal. Attached to it was a copy of the e-mail sent by David to Van Donk in March 2004. The parts of the e-mail that Bono's complaint singled out as defamatory were David's several descriptions of her as "unstable," "not capable of trust or honesty," "absolutely untrustworthy," etc.

Appellant David demurred to the complaint on May 27, 2005. Her demurrer was based on the theory that the e-mail at issue was subject to the "mediation privilege" under Civil Code section 47, subdivision (b), and her statements therein were otherwise inadmissible and/or nonactionable. On

August 31, 2005, the trial court overruled the demurrer on the basis that it could not determine "from the face of the Complaint and the attached document" whether the latter was a "pre-litigation communication and/or a mediation communication as to which privilege would apply and the communication would be inadmissible."

On September 2, 2005, David filed a motion to consolidate the defamation action with the partition and declaratory relief actions, to compel arbitration of all three actions, and to stay proceedings in them until the arbitration was completed. Although not the central point of her motion, David's supporting papers cited section 1281.2 and noted that she was entitled to both mediation and arbitration of all three actions because, among other things, "this is all one controversy." A few days later, David also renoticed a hearing on her February 2005 demurrer, noticing the hearing for October 17, 2005. Accompanying her notice of motion was an additional memorandum of points and authorities in the defamation action only, arguing that the demurrer should be sustained because of Bono's failure to exhaust her remedies of mediation and arbitration.

In opposition to David's motion and renewed demurrer, Bono argued that her defamation action did not "involve the 'construction or application of any provision' contained in the MOU . . . ."

The trial court heard oral argument on David's motion and demurrer on October 21, 2005. After hearing argument from David's counsel and Bono, it denied the motion to compel arbitration of the defamation claim. The court stated that it did not agree that "the alleged defamation arose from the contract or that the contract needs to be interpreted somehow in order to determine the defamation action." An order denying David's motion to compel arbitration and overruling her demurrer was filed the same day and a notice of appeal by David one week later.

## III. DISCUSSION

A. *Our Standard of Review and Some Relevant Legal Principles.*

Where there is no "*factual* dispute as to the language of [the] agreement" (*Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, 684 [99 Cal.Rptr.2d 809] (*Coast Plaza*)) or "conflicting extrinsic evidence" regarding the terms of the contract (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188] (*Vianna*)), our standard of review of a trial court order granting or denying a

motion to compel arbitration under section 1281.2 is de novo. (*Coast Plaza, supra,* at p. 684; *Vianna, supra,* at p. 1189; see also *Buckhorn v. St. Jude Heritage Medical Group* (2004) 121 Cal.App.4th 1401, 1406 [18 Cal.Rptr.3d 215] (*Buckhorn*); *Maggio v. Windward Capital Management Co.* (2000) 80 Cal.App.4th 1210, 1214 [96 Cal.Rptr.2d 168]; *Larkin v. Williams, Woolley, Cogswell, Nakazawa & Russell* (1999) 76 Cal.App.4th 227, 229 [90 Cal.Rptr.2d 195] (*Larkin*).) Such is the case here.

■ Our Supreme Court has emphasized, indeed several times, that arbitration of disputes is favored and that, when there is doubt as to the meaning and construction of an agreement for mediation and/or arbitration, that doubt should be resolved in favor of those processes. Thus, in *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951 [64 Cal.Rptr.2d 843, 938 P.2d 903], the court wrote: "California law incorporates many of the basic policy objectives contained in the Federal Arbitration Act, including a presumption in favor of arbitrability [citation] and a requirement that an arbitration agreement must be enforced on the basis of state law standards that apply to contracts in general . . . ." (*Id.* at pp. 971–972, citation omitted.) And in its earlier landmark decision in *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1 [10 Cal.Rptr.2d 183, 832 P.2d 899], the court, quoting from even earlier decisions, stressed that through the provisions of the Code of Civil Procedure governing arbitration, "the Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution' " and that the courts "will ' "indulge every intendment to give effect to such proceedings." ' " (*Id.* at p. 9.)

■ The *Coast Plaza* court cited *Moncharsh* and other precedent in summing up the general law in this area thusly: "California has a strong public policy in favor of arbitration and any doubts regarding the arbitrability of a dispute are resolved in favor of arbitration. [Citations.] As the Supreme Court recently noted, '. . . the decision to arbitrate grievances evinces the parties' intent to bypass the judicial system and thus avoid potential delays at the trial and appellate levels . . . .' [Citation.] This strong policy has resulted in the general rule that arbitration should be upheld 'unless it can be said with assurance that an arbitration clause is not susceptible to an interpretation covering the asserted dispute. [Citation.]' [Citation.] [¶] It seems clear that the burden must fall upon the party opposing arbitration to demonstrate that an arbitration clause *cannot* be interpreted to require arbitration of the dispute. Thus, if there is any reasonable doubt as to whether Coast Plaza's claims come within the Service Agreement's arbitration clause, that doubt must be resolved in favor of arbitration, not against it. [Citations.]" (*Coast Plaza, supra,* 83 Cal.App.4th at pp. 686–687.) In her briefs to us, David relies strongly on the principles just noted.

■ But there is another principle that needs to be considered. As our Supreme Court stressed several decades ago, the contractual terms themselves must be carefully examined before the parties to the contract can be ordered to arbitration: "Although '[t]he law favors contracts for arbitration of disputes between parties' [citation], ' "there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate . . . ." ' [Citations.] In determining the scope of an arbitration clause, '[t]he court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made [citation].' [Citation.]" (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 744 [222 Cal.Rptr. 1, 710 P.2d 833].)

■ Following on from this, and as other Courts of Appeal have regularly observed, the terms of the specific arbitration clause under consideration must reasonably cover the dispute as to which arbitration is requested. This is so because "[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate." (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653 [35 Cal.Rptr.2d 800]; see also *Medical Staff of Doctors Medical Center in Modesto v. Kamil* (2005) 132 Cal.App.4th 679, 684 [33 Cal.Rptr.3d 853] (*Kamil*); *Larkin, supra*, 76 Cal.App.4th at p. 230; *United Public Employees v. City and County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026 [62 Cal.Rptr.2d 440]; *County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245 [54 Cal.Rptr.2d 628]; *Hayes Children Leasing Co. v. NCR Corp.* (1995) 37 Cal.App.4th 775, 787 [43 Cal.Rptr.2d 650]; *Luster v. Collins* (1993) 15 Cal.App.4th 1338, 1346 [19 Cal.Rptr.2d 215].)

Indeed, this principle is effectively prescribed by Civil Code section 1648, which provides: "However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract." (Civ. Code, § 1648.)

B. *Does the Language of the MOU Cover Bono's Defamation Action?*

Increasingly over recent years, in deciding whether or not a particular arbitration clause applies to the dispute in question, our sister courts have carefully considered the breadth—or lack thereof—of the arbitration clause of the pertinent agreement. Thus, in *Wolitarsky v. Blue Cross of California* (1997) 53 Cal.App.4th 338 [61 Cal.Rptr.2d 629], a case relied upon by David, the court addressed the argument of appellant Blue Cross that an arbitration clause in a health insurance policy issued by it covered a claim that it had violated state and federal laws against gender discrimination by imposing an additional deductible charge for maternity benefits on the plaintiff insureds.

The clause at issue provided: " '*Any dispute* between the Member and Blue Cross regarding the decision of Blue Cross must be submitted to binding arbitration if the amount in dispute exceeds the jurisdictional limits of the small claims court.' " (*Id.* at p. 348, italics added.) The court found that this clause was "written with sufficient breadth" to encompass the issue in the litigation. (*Ibid.*)

Similarly, in *Larkin, supra*, 76 Cal.App.4th at pages 229–231, a case also relied upon by David, the court was faced with an appeal by a law partnership from an order of the trial court denying its motion to compel arbitration of a dispute with a withdrawing partner who had filed a complaint for dissolution and an accounting. The partnership agreement provided: "*Any controversy or claim arising out of or relating to any provision of this Agreement or the breach thereof* shall be settled by arbitration . . . ." (*Id.* at p. 229, italics added.) In reversing the lower court and ordering the matter into arbitration, the appellate court specifically noted: "The arbitration clause at issue is *very broad.* . . . Plaintiff's complaint for dissolution and an accounting clearly arises out of and relates to the partnership agreement." (*Id.* at p. 230, italics added.)

And in *Coast Plaza, supra*, 83 Cal.App.4th at pages 684–687, yet another case relied upon by David, the appellate court reviewed a lower court's order denying a motion to compel arbitration of the plaintiff hospital's suit against Blue Cross, a suit based on "numerous tort theories, all related to the reimbursement rates paid by Blue Cross pursuant to a service agreement with Coast Plaza." (*Id.* at p. 680.) That agreement contained, predictably, a "very broad arbitration clause" requiring the arbitration of " '[*a*]*ny problem or dispute arising under this Agreement and/or concerning the terms of this Agreement* . . . .' " (*Id.* at p. 681 & fn. 2.) Based on this wording, the court reversed the trial court's order, stating: "It has long been the rule in California that a broadly worded arbitration clause, such as we have here, may extend to tort claims that may arise under or from the contractual relationship." (*Id.* at p. 686.)

David relies strongly on an even more recent case cited above, *Buckhorn.* There, the appellate court had before it a trial court order denying a motion to compel arbitration of a wrongful termination action filed by a terminated physician against his former medical group. The terminated plaintiff had an employment agreement with that group which provided for the mandatory arbitration of disputes "concerning the enforcement or the interpretation of any provisions of this Agreement." In reversing the trial court's order denying the motion to compel arbitration, the *Buckhorn* court relied on *Vianna, supra*, 27 Cal.App.4th 1186, holding that in both cases the plaintiffs' "tort claims were '*rooted* in the employment relationship created by [the] contract' "

(*Buckhorn, supra*, 121 Cal.App.4th at p. 1407) rather than being " 'wholly independent' of the contract between the parties." (*Ibid.*)

In so holding, the *Buckhorn* court explained: "The issue turns on whether the tort claims are 'rooted' in the contractual relationship between the parties, not when they occurred. For example, Buckhorn's claims for intentional and negligent interference with prospective economic advantage were based on an expectation of future income from his patients. But Buckhorn's patients consulted him in his capacity as an employee of the Medical Group and therefore the employment agreement would inform the extent of any economic interest. Because Buckhorn failed to demonstrate his tort claims were 'wholly independent' of the employment agreement, and any doubts must be resolved in favor of arbitration [citing *Vianna*], we conclude all of Buckhorn's claims must be submitted to arbitration." (*Buckhorn, supra*, 121 Cal.App.4th at pp. 1407–1408.)

But an even more recent case—and the only authority cited in Bono's brief to us—goes in the other direction. It is *Kamil, supra*, 132 Cal.App.4th at pages 683–684. That case involved a controversy between Blue Cross and some of its affiliates and personnel on the one hand and several groups of physicians practicing at a Modesto hospital. Those groups, the plaintiffs, sued Blue Cross and the other defendants for defamation after they allegedly issued several press releases and other publications stating that "59 percent of the heart procedures performed by [the plaintiffs] were medically unnecessary." (*Id.* at p. 682.) Via correspondence, Blue Cross also gave notice of its intent to terminate its agreement with the hospital employing the plaintiff physicians. (*Ibid.*)

After the plaintiffs sued Blue Cross and the other defendants for defamation, the latter moved to compel arbitration under its agreements with them. The trial court denied that motion because it concluded that "the arbitration clause is not broad enough to encompass the dispute." (*Kamil, supra*, 132 Cal.App.4th at p. 682.) Presiding Justice Gilbert, writing for a unanimous court, agreed. He wrote: "The agreement between Blue Cross and Physicians contains a general arbitration clause that provides in part: 'BLUE CROSS and PHYSICIAN agree to meet and confer in good faith to resolve any problems or disputes that may arise under this Agreement. [¶] In the event that any problem or dispute concerning the terms of this Agreement . . . is not satisfactorily resolved, BLUE CROSS and PHYSICIAN agree to arbitrate such problem or dispute.' [¶] The first sentence of the clause requires the parties to confer in good faith to resolve disputes that arise under the agreement. The next sentence apparently limits arbitration to those disputes *concerning the terms of the agreement.* [¶] . . . [¶] Blue Cross argues the cases establish that a broadly worded arbitration clause applies to any

controversy that has its ' "roots" ' in the contractual relationship. [Citation.] It relies on the general arbitration clause that requires arbitration of disputes concerning the terms of the agreement. Even assuming this clause can reasonably be read to encompass disputes having 'roots' in the contract relationship, or arising out of that relationship, Blue Cross does not prevail. [¶] We interpret a contract to give effect to the mutual intent of the parties as expressed in its language. [Citation.] The words of the contract are given their ordinary and popular meaning unless used by the parties in a technical sense. [Citation.] We construe the contract in light of the circumstances under which it was made, including its subject. [Citation.] [¶] Here the contract between Blue Cross and Physicians is to provide medical care for Blue Cross beneficiaries. The question is whether the seemingly innocuous phrase 'concerning the terms of' the agreement to provide medical care can reasonably be said to include the alleged malicious destruction of the Physicians' personal and professional reputations. To ask the question is to answer it. The answer is no. *There may be cases where the alleged defamation is so intimately bound with the terms of the agreement that arbitration is appropriate.* But the terms of this agreement do not give Blue Cross carte blanche to publicly pillory Physicians in press releases and newspaper reports as alleged here. The defamation complained of here no more concerns the terms of the agreement, than would a punch in the nose during a dispute over a medical billing." (*Kamil, supra,* 132 Cal.App.4th at pp. 682–684, some italics added.)

The *Kamil* court distinguished *Vianna,* the case David relies upon most strongly here. In that case, the plaintiff was a former vice-president for human relations who was forced to resign from his employment but then sued his former employer and some of its officers for "termination in violation of public policy," breach of the covenant of good faith and fair dealing, negligent infliction of emotional distress, and defamation. (*Vianna, supra,* 27 Cal.App.4th at pp. 1188–1189.) The parties' employment agreement contained an arbitration clause which covered " 'any dispute of any kind whatsoever, regarding the meaning, interpretation or enforcement of the provisions of this Agreement . . . .' " (*Id.* at p. 1188.)

The trial court denied the defendants' motion to compel arbitration, but Division Four of this court reversed, finding the arbitration clause sufficiently broad to cover both the principal wrongful termination claim and also the related claims. It held: "Because California has a ' "strong public policy in favor of arbitration" ' [citation], '. . . arbitration agreements should be liberally interpreted, and arbitration should be ordered unless the agreement clearly does not apply to the dispute in question' [citation]. 'Doubts as to whether an arbitration clause applies to a particular dispute are to be resolved in favor of sending the parties to arbitration.' [Citation.] [¶] The trial court's finding that the arbitration agreement did not cover the claims against

Doctors cannot be sustained in light of the foregoing principles. The agreement to arbitrate 'any dispute' regarding 'enforcement' of the provisions of the contract plainly covers Vianna's claim for breach of the covenant of good faith and fair dealing. [Citation.] The other claims all involve duties arising by operation of law, which were allegedly breached during the employment relationship. The parties at least arguably agreed to arbitrate those claims as well when they reduced all of the terms of that relationship to writing, and provided for arbitration 'of any dispute of any kind whatsoever' over the terms of the contract. It cannot be said that the arbitration clause clearly does not apply to those additional disputes, and the doubt must be resolved in favor of arbitration." (*Vianna, supra,* 27 Cal.App.4th at pp. 1189–1190.)

■  We conclude that *Vianna* is inapplicable here. Rather, we believe the trial court was correct in concluding that, because Bono's defamation action does not involve the construction or application of any provision of the real property agreement, the mandatory mediation and arbitration clause of that agreement does not apply.

■  As the secondary authorities which analyze many of the cases cited above—and others—strongly suggest, the decision as to whether a contractual arbitration clause covers a particular dispute rests substantially on whether the clause in question is "broad" or "narrow." (See Knight et al., Cal. Practice Guide: Alternative Dispute Resolution (The Rutter Group 2005) ¶ 5:215.3; see generally *id.*, ¶¶ 5:8 & 5.215 to 5:225.) A "broad" clause includes those using language such as *"any claim* arising from or *related to* this agreement" (*id.*, ¶ 5:222) while "[m]ore narrowly worded clauses" are considered "dangerous to utilize" (*id.*, ¶ 5:223)—presumably meaning "dangerous" to the party wanting to arbitrate disputes under it.

We agree, and it is exactly such "narrow" terminology that is before us here. Once again, the mandatory arbitration clause in the land development agreement at issue covers, and covers only, a controversy involving "the construction and application of any provision of this Agreement." This is substantially narrower than, for example, the clauses at issue in *Larkin, Coast Plaza, Vianna,* and *Wolitarsky,* all of which used terminology such as "any controversy arising out of or relating to" and the like.

Several published decisions have expressly noted the difference in results when dealing with a motion to compel arbitration under a narrowly drawn arbitration clause. Thus, in *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1369–1372 [62 Cal.Rptr.2d 27], the court held that a lawyer who had secured his client's signature on an engagement letter containing a clause

requiring the arbitration of " 'any controversy arising out of or related to the [lawyer's] engagement for legal matters' " did not cover a dispute between the two men relating to money the client sent the attorney "in conjunction with a business dealing." (*Id.* at pp. 1367–1368.) And in *Parker v. Twentieth Century-Fox Film Corp.* (1981) 118 Cal.App.3d 895 [173 Cal.Rptr. 639], the agreement at issue—a television joint venture agreement—required outside audits in the event of disputes regarding "receipts and proceeds and expenses." (*Id.* at p. 903.) The court held that this language was "far too narrow" to permit an order for arbitration of disputes set forth in a complaint which alleged usury, fraud, breach of contract and the like, and asked for rescission, declaratory relief, etc. (*Id.* at p. 904.) In so holding, the court specifically noted that it was "not dealing with the usual, all-inclusive arbitration clause." (*Ibid.*; cf. *Hall v. Superior Court* (1993) 18 Cal.App.4th 427, 435 [22 Cal.Rptr.2d 376].)

David makes several arguments in urging a "broad" interpretation of the arbitration provision of the MOU. First of all, she argues—albeit briefly—that the word "involving" in the clause at issue "must be here given the broadest possible interpretation." But that word precedes, and is clearly limited by, the next, far more important words in the clause, namely "the construction and application of any provision of this Agreement." Next, David argues, regarding the language she used in the e-mail in question: *"No trier of fact could understand the meaning of Ms. David's words without first being advised of the context in which they were said . . . ."* We disagree: Nothing in the MOU aids the understanding of phrases such as "[s]he is very, very unstable" or "[s]he needs serious psychological help."

Secondly, David and her counsel contend that, because (1) the trial court overruled David's demurrer to Bono's defamation complaint on the ground that it could not determine from that complaint if, in fact, Van Donk was engaged in a "mediation" which might trigger application of the mediation privilege[3] and (2) Bono had effectively agreed, via her affirmative defense in the consolidated partition and declaratory relief actions, to mediation and arbitration, she is now precluded from arguing to the contrary in this case. Neither argument has merit. The answer to the first is that nothing in the trial court's ruling overruling David's demurrer on the grounds of mediation privilege forecloses a motion for summary judgment on the same grounds. Similarly, Bono's concession to mediation and arbitration in the partition and declaratory relief actions does not, in our opinion, estop her from contending

---

[3] See Evidence Code sections 1115 and 1119 and Civil Code section 47, subdivision (b).

that the mediation and arbitration clause in the MOU is too narrow to encompass defamation claims arising out of the e-mail in question.[4]

Thirdly and finally, at oral argument, David's counsel contended that, because she had alleged in her earlier demurrer to the action that her e-mail characterizations of Bono were made in the course of a mediation, resolution of *that* issue requires an interpretation of the mediation and arbitration clause itself. We disagree. In the first place, in opposing David's demurrer, Bono specifically contested the suggestion that Van Donk was anything more than a "personal friend and regular teacher of mine" and, at oral argument, neither party contended that he had been selected as a mediator by the two-thirds vote required by the clause in question. More importantly, although the trial court overruled David's demurrer regarding the application of the "mediation privilege," it did so very carefully. It noted that, from the facts in front of it, it simply could not "ascertain" if the e-mail in question "was . . . a mediation communication to which privilege would apply and the communication would be inadmissible," and specifically noted that its ruling was "without prejudice to [David's] right to raise [that issue] by further pleadings, and to present [it] again by way of motion."

We agree with the trial court that a pleading and/or motion raising a "mediation privilege" defense is an appropriate vehicle for determining whether any such privilege applies here. A petition to compel arbitration is not such a vehicle because the issue of whether Van Donk was even remotely acting as a "mediator" at the time he received the offending e-mail is not crucial to—or even particularly pertinent to—the arbitrability of the defamation dispute under the narrowly worded clause in question.

Here, five years and much else had passed under the proverbial bridge between the execution of the land development agreement and the filing of Bono's defamation lawsuit against David. Clearly, and as the trial court held in other proceedings before it, many if not all of the other disputes between the parties did, indeed, involve "the construction or application of any provision" of the agreement. And, clearly, whatever was going on between Bono and David which precipitated the latter's e-mail to Van Donk was "related to" that agreement. But the arbitration clause before us here contains no language similar to the fairly standard "related to" or "arising from" terminology. Its terminology is much narrower than that, and far too narrow to permit us to reverse the ruling of the trial court.

---

[4] In the course of making the second argument just noted, David contends that the trial court's September 2, 2004, order compelling mediation of the partition action used "language . . . which was imported from the MOU's arbitration provision." This is incorrect, as a comparison of the language of that order with the language of the MOU will quickly demonstrate.

## IV. DISPOSITION

The order appealed from is affirmed.

Kline, P. J., and Richman, J., concurred.