Filed 6/20/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| CITY OF LOS ANGELES, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | S192828 |
| v. | ) | |
| | ) | Ct.App. 2/3 B228732 |
| THE SUPERIOR COURT OF | ) | |
| LOS ANGELES COUNTY, | ) | |
| | ) | Los Angeles County |
| Respondent; | ) | Super. Ct. No. BS126192 |
| | ) | |
| ENGINEERS & ARCHITECTS | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Real Party in Interest. | ) | |
| _____ | ) | |

After declaring a fiscal emergency, a charter city adopted a mandatory furlough program for its civilian employees. Many employees represented by a union filed grievances against the city, arguing that the furloughs violated duly ratified memorandums of understanding (MOUs) governing the terms and conditions of their employment. When their grievances were denied, these employees requested arbitration, and when the city refused to arbitrate, their union petitioned the superior court for an order compelling the city to arbitrate the furloughs dispute. The superior court granted the union's petition.

The city then petitioned the Court of Appeal for a writ of mandate, asking it to overturn the superior court's decision. After issuing an order to show cause, and setting the matter for a hearing, the Court of Appeal granted the city's petition.

1

Assuming, without deciding, that the employees' grievances are subject to arbitration under the terms of the MOUs, the Court of Appeal concluded that the city could not be compelled to arbitrate because arbitration would constitute an unlawful delegation to the arbitrator of discretionary policymaking powers that the city's charter vested in its city council.

To address the important issues raised by the Court of Appeal's decision, this court granted the union's petition for review. The issue presented in that petition is whether a charter city may arbitrate disputes over collectively bargained wage and hour provisions without unlawfully delegating to the arbitrator its discretionary budgeting and salary-setting authority. At this court's request, the parties also briefed another issue, which is whether, under the MOUs at issue here, the city has a contractual duty to arbitrate the employee furloughs dispute.

We conclude, first, that arbitration of the dispute at issue here does not constitute an unlawful delegation of discretionary authority to the arbitrator and, second, that the city is contractually obligated to arbitrate the employee furloughs dispute. Thus, we reverse the Court of Appeal's judgment.

## I. FACTS

Faced with a deficit exceeding $500 million, the Mayor of the City of Los Angeles (the City) on May 12, 2009, sent a letter to the city council asking it to declare a fiscal emergency and to adopt an urgency ordinance permitting full-time city employees' workweeks to be reduced to less than 40 hours. In response to the letter, the city council passed a resolution declaring an emergency and directing the mayor to adopt a plan to furlough city employees for up to 26 days per fiscal year. On May 22, the mayor approved the resolution, which thereby became an ordinance.

The mayor adopted a plan requiring civilian city employees to take one unpaid furlough day during each 80-hour pay period, effective July 5, 2009. In

2

response, approximately 400 employees represented by the Engineers & Architects Association (the Union) filed grievances, arguing that the furloughs violated the wage and workweek provisions of the MOUs governing their employment.  The City denied the grievances at each level of review.  Under the terms of the MOUs, the final step of the grievance process is submission of the dispute to binding arbitration before the City's Employee Relations Board.  The Union and the employees timely requested arbitration, but the City refused to arbitrate, asserting that its decision to impose mandatory furloughs was not subject to arbitration.

On April 29, 2010, the Union filed in superior court a petition to compel arbitration of the furloughs dispute.  After considering the City's opposition papers, and holding a hearing, the superior court granted the Union's petition.  The City petitioned the Court of Appeal for a writ of mandate.

After issuing an order requiring all parties to appear before it to show cause "why the relief requested in the petition should or should not be granted," the Court of Appeal granted the City's petition.  The Court of Appeal assumed, without deciding, that under the terms of the governing MOUs the City's decision to impose mandatory employee furloughs was subject to review by an arbitrator, but the Court of Appeal concluded that any such agreement to arbitrate was unenforceable because binding arbitration of the dispute would improperly delegate to the arbitrator the City's discretionary salary-setting and budget-making authority.  The Court of Appeal directed the superior court to conduct further proceedings consistent with its opinion.  We granted the Union's petition for review.

## II.  DELEGATION OF AUTHORITY

The Meyers-Milias-Brown Act (Gov. Code, § 3500 et seq.; the MMBA) "governs collective bargaining and employer-employee relations for most

3

California local public entities, including cities, counties, and special districts."
(*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077.) The MMBA's purpose is to provide a reasonable method of resolving disputes between public employers and public employee organizations regarding wages, hours, and other terms and conditions of employment. (Gov. Code, § 3500, subd. (a).) "The MMBA imposes on local public entities a duty to meet and confer in good faith with representatives of recognized employee organizations, in order to reach binding agreements governing wages, hours, and working conditions of the agencies' employees. (Gov. Code, § 3505.)" (*Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.*, *supra*, at p. 1083.)

If the parties reach an agreement, they jointly prepare a written MOU stating the terms upon which they have agreed. (Gov. Code, § 3505.1.) Once a local government approves an MOU, it becomes a binding and enforceable contract that neither side may change unilaterally. (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 334-338; accord, *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1182-1183; *Voters for Responsible Retirement v. Board of Supervisors* (1994) 8 Cal.4th 765, 781.)

As noted earlier, after the City here adopted its furlough program, some 400 civilian city employees represented by the Union filed grievances alleging that the furloughs violated the wage and workweek provisions of ratified MOUs governing their employment. The City denied the grievances at each stage of the grievance process. Under the terms of the MOUs that the City had ratified, the final step of the grievance process is submission to binding arbitration before the Employee Relations Board. But the City refused to arbitrate the question whether the

4

furloughs violated the ratified and binding collective bargaining agreements with its employees.

The Court of Appeal concluded, first, that whether the furloughs dispute is subject to arbitration is a matter to be decided by the courts rather than by the arbitrator. The Union does not challenge that conclusion, which is well supported by authority. Unless an arbitration agreement expressly provides otherwise, a dispute regarding the scope of a contractual duty to arbitrate is subject to judicial resolution. (*AT&T Technologies v. Communications Workers* (1986) 475 U.S. 643, 649; *Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 479-480; *United Public Employees v. City and County of San Francisco* (1997) 53 Cal.App.4th 1021, 1026.) Here, because the parties' MOUs did not expressly authorize the arbitrator to determine whether particular disputes were subject to arbitration, that determination was for the court to make.

Next, the Court of Appeal considered the nature of the furloughs dispute in light of the arbitration provision in the MOUs. The furloughs dispute concerns articles 1.9 and 3.1 of the MOUs. Article 3.1 broadly defines "grievance" to include "any dispute concerning the interpretation or application of this written MOU or departmental rules and regulations governing personnel practices or working conditions applicable to employees covered by this MOU." The Union argues that furloughs, because they affect working conditions, are subject to the grievance process, particularly when the City's right to unilaterally furlough employees depends on interpretation and application of the MOUs. The Union relies specifically on article 5.1 of the MOUs, which provides, as relevant here, that "[e]mployees shall be compensated for 40 hours per week at the regular hourly rate for their class and pay grade." The Union also relies on article 6.1's references to salary schedules that are based on a work year consisting of 52 weeks of 40 hours each.

5

In response, the City relies primarily on article 1.9 of the MOUs, entitled "Management Rights." As relevant here, it provides: "[E]xcept as specifically set forth herein no provisions in this MOU shall be deemed to limit or curtail the City officials and department heads in any way in the exercise of the rights, powers and authority which they had prior to the effective date of this MOU. . . . [T]hese rights, powers, and authority include but are not limited to, the right to . . . *relieve City employees from duty because of lack of work, lack of funds or other legitimate reasons,* . . . [and to] *take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies*; provided, however, that the exercise of these rights does not preclude employees and their representatives from consulting or raising grievances about the practical consequences that decision on these matters may have on wages, hours, and other terms and conditions of employment." (Italics added.)

The City argues that unilaterally imposing employee furloughs is encompassed by article 1.9's provision preserving its authority to "relieve City employees from duty because of . . . lack of funds . . . [and to] take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies," and that under article 1.9 an employee grievance cannot be used to challenge a furlough decision; rather, a grievance can be brought only in regard to the practical consequences of that decision. In response, the Union argues that the quoted provision authorizes only layoffs, not furloughs, and does not negate or override the MOUs' wage and workweek provisions.

The Court of Appeal here concluded that it was unnecessary to have either the trial court or the arbitrator determine the merits of the parties' respective arguments concerning the proper interpretation of the MOUs. The court reasoned that, regardless of the provision in the MOUs requiring arbitrations of disputes concerning the meaning of the MOUs' terms as the final step of the grievance

6

process, the City could not be compelled to arbitrate the validity of the furlough program because such arbitration would constitute an unlawful delegation to the arbitrator of two discretionary policymaking powers — salary setting and budget making — that the City's charter vests in the city council.

The Court of Appeal was correct in stating that, unless a statute expressly allows them to do so, public agencies and officers may not surrender or delegate to subordinates any powers involving the exercise of judgment or discretion. (*Bagley v. City of Manhattan Beach* (1976) 18 Cal.3d 22, 24; *California Sch. Employees Assn. v. Personnel Commission* (1970) 3 Cal.3d 139, 144.) It was also correct in characterizing the powers to set salaries and fix the budget as discretionary powers. But the Court of Appeal was incorrect in its conclusion that arbitration of the furloughs dispute here would involve a surrender or delegation by the City of those discretionary powers.

By ratifying the MOUs, the City made discretionary choices in the exercise of its salary-setting and budget-making authority. By deciding whether the furlough program violates the terms of those MOUs, the arbitrator would not be exercising any such discretionary authority. Rather, the arbitrator's role would be limited to interpreting the MOUs for the purpose of determining whether the furlough program violates the terms of those MOUs. Indeed, the arbitration provision of the MOUs states that "[t]he decision of an arbitrator resulting from any arbitration of grievances hereunder *shall not add to, subtract from, or otherwise modify the terms and conditions of this MOU*."

Some 34 years ago we observed: "Grievance arbitration does not involve the making of general public policy. Instead, the arbitrator's role is confined to interpreting and applying terms which the employer itself has created or agreed to and which it is capable of making more or less precise." (*Taylor v. Crane* (1979) 24 Cal.3d 442, 453.) In determining the validity of the employees' grievances, the

arbitrator's role will be entirely adjudicative, not legislative. (See *Glendale City Employees' Assn., Inc. v. City of Glendale*, *supra*, 15 Cal.3d 328, 344-345 [computing and paying city employee salaries according to the terms of a ratified MOU is a nonlegislative, ministerial act].) Accordingly, submission to the arbitrator of the employees' claim here that the furlough program violates the MOUs does not constitute an improper delegation to the arbitrator of any of the City's discretionary authority.

The City argues that under its charter it "may not agree to an MOU which purports to impair the obligations of the City's elected officials . . . to take all necessary actions to carry out the City's mission in an emergency." It reasons that because the mayor must submit a proposed budget annually and the city council must enact a budget annually, and because the budget reflects the exercise of discretion and judgment, an MOU may not restrict the choices available to the mayor and city council in later years. But the same argument could be applied not only to MOUs, but also to other multiyear financial commitments, including contractual obligations to independent contractors, creditors, and vendors. Any such multiyear commitment limits the budgetary options available in the years that follow, and yet financial commitments of this sort have never been held to be inherently impermissible or unenforceable. In this regard, the City's reliance on *White v. Davis* (2003) 30 Cal.4th 528 is misplaced. This court there held that state employees do not have the right to immediate or timely salary payments during a budget impasse, but we also stressed that in such situations employees do have the right ultimately to be paid the full salary they have earned. (*Id.*, at pp. 570-571.) The existence of an annual budget process does not prohibit a governmental entity from entering into multiyear financial commitments, nor does it provide a justification for avoiding or repudiating such commitments.

8

For these reasons, we conclude that arbitration of the employee grievances challenging the furlough program as being in violation of the MOUs does not involve an unlawful delegation of the city council's discretionary salary-setting and budget-making authority.

### III. ARBITRABILITY

As we have stated (see p. 5, *ante*), unless an arbitration agreement expressly provides otherwise, a dispute regarding the arbitrability of a particular dispute is subject to judicial resolution.  In performing its duty to determine whether a party has a contractual duty to arbitrate a particular dispute, a court is required "to examine and, to a limited extent, construe the underlying agreement." (*Freeman v. State Farm Mut. Auto Ins. Co.*, *supra*, 14 Cal.3d 473, 480.)  When a court interprets a collective bargaining agreement for the purpose of deciding whether a particular grievance is arbitrable, however, its authority to interpret the agreement is subject to certain well-established restrictions.

For disputes arising under collective bargaining agreements, there is a "presumption of arbitrability," under which a court should order arbitration of a grievance " 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.' " (*AT&T Technologies v. Communications Workers*, *supra*, 475 U.S. at p. 650, quoting *Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 582-583 (*Warrior & Gulf*).)  "This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, 'furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining.' " (*AT&T Technologies v. Communications Workers*, at p. 650, quoting *Schneider Moving & Storage Co. v. Robbins* (1984) 466 U.S. 364, 371-372.)

9

The United States Supreme Court has given this explanation of the importance of arbitration in labor disputes: "[T]he grievance machinery under a collective bargaining agreement is at the very heart of the system of industrial self-government. Arbitration is the means of solving the unforeseeable by molding a system of private law for all the problems which may arise and to provide for their solution in a way which will generally accord with the variant needs and desires of the parties. The processing of disputes through the grievance machinery is actually a vehicle by which meaning and content are given to the collective bargaining agreement." (*Warrior & Gulf*, *supra*, 363 U.S. 574, 581.)

Because of this central role played by arbitration in the interpretation and enforcement of labor agreements, "[a]part from matters that the parties specifically exclude, all of the questions on which the parties disagree must . . . come within the scope of the grievance and arbitration provisions of the collective agreement." (*Warrior & Gulf*, *supra*, 363 U.S. 574, 581.) Moreover, in deciding whether a particular labor dispute is covered by a collective bargaining agreement's arbitration provision, "[d]oubts should be resolved in favor of coverage." (*Id.* at p. 583; accord, *AT&T Technologies v. Communications Workers*, *supra*, 475 U.S. at p. 649.)

## A. The MOUs' Arbitration Provision

To determine whether the furloughs dispute here is arbitrable, we begin by examining the MOUs' arbitration provision. Article 3.1's section I(A) defines "grievance" as "any dispute concerning the interpretation or application of this written MOU or departmental rules and regulations governing personnel practices or working conditions applicable to employees covered by this MOU." Article 3.1's section III specifies the grievance procedure for resolving such disputes. The final step of that six-step procedure is submission of the grievance to arbitration,

10

which is "to be conducted in accordance with applicable rules and procedures adopted or specified by the Employee Relations Board, unless the parties agree to other rules or procedures for the conduct of such arbitration." The scope of the arbitration is "limited to the formal grievance originally filed by the employee to the extent that said grievance has not been satisfactorily resolved." With exceptions not relevant here, the arbitrator's decision "shall be binding on the parties concerned," but that decision may not "add to, subtract from, or otherwise modify the terms and conditions of [the] MOU."

Under the MOUs' arbitration provision, therefore, the City has assumed a general contractual obligation to arbitrate disputes concerning the interpretation of the MOUs. We next consider whether the employee furloughs dispute here is such a dispute and, thereafter, whether any provision of the MOUs exempts this dispute from arbitration.

### B.  The Furloughs Dispute

In deciding whether the dispute at issue is one concerning the interpretation of the MOUs, we are mindful that "where the collective bargaining agreement provides for arbitration of all disputes pertaining to the meaning, interpretation and application of the collective bargaining agreement and its provisions, any dispute as to the meaning, interpretation and application of any specific matter covered by the collective bargaining agreement is a matter for arbitration." (*Posner v. Grunwald-Marx, Inc.* (1961) 56 Cal.2d 169, 175; accord, *United Teachers of Los Angeles v. Los Angeles Unified School Dist.* (2012) 54 Cal.4th 504, 518 (*United Teachers*).) "The function of the court is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. It is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." (*Steelworkers v. American Mfg.*

11

*Co.* (1960) 363 U.S. 564, 567-568; accord, *United Teachers*, at p. 519.) Moreover, in deciding whether there is a contractual duty to arbitrate a labor dispute, courts "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." (*Steelworkers v. American Mfg. Co.*, *supra*, at p. 568, fn. omitted; accord, *AT&T Technologies v. Communications Workers*, *supra*, 475 U.S. 643, 650; see also Code Civ. Proc., § 1281.2 [stating that an order compelling arbitration "may not be refused on the ground that the petitioner's contentions lack substantive merit"].)

Here, as previously explained (see pp. 5-6, *ante*), the employee grievance is that City's imposition of employee furloughs violated the wage and workweek provisions of the MOUs. In support of that grievance, the Union relies specifically on article 5.1 of the MOUs, which provides, as relevant here, that "[e]mployees shall be compensated for 40 hours per week at the regular hourly rate for their class and pay grade." The Union also relies on article 6.1's references to salary schedules that are based on a work year consisting of 52 weeks of 40 hours each.

In response, the City relies primarily on the MOUs' management rights clause, article 1.9. In full, that clause states: "As the responsibility for the management of the City and direction of its work force is vested exclusively in its City officials and department heads whose powers and duties are specified by law, it is mutually understood that except as specifically set forth herein no provisions in this MOU shall be deemed to limit or curtail the City officials and department heads in any way in the exercise of the rights, powers and authority which they had prior to the effective date of this MOU. The Association recognizes that these rights, powers, and authority include but are not limited to, the right to determine

12

the mission of its constituent departments, offices and boards, set standards of services to be offered to the public, exercise control and discretion over the City's organization and operations, take disciplinary action for proper cause, relieve City employees from duty because of lack of work, lack of funds or other legitimate reasons, determine the methods, means and personnel by which the City's operations are to be conducted, take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies; provided, however, that the exercise of these rights does not preclude employees and their representatives from consulting or raising grievances about the practical consequences that decisions on these matters may have on wages, hours, and other terms and conditions of employment."

The City argues that article 1.9 reserves to it the right to impose employee furloughs during a fiscal emergency under the language recognizing its rights to "relieve City employees from duty because of . . . lack of funds" and to "take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies."

The Union makes two arguments in response. Regarding the provision of the management rights clause reserving a management right to "relieve City employees from duty," the Union argues that this refers only to layoffs, not furloughs. Regarding both of the management rights clause provisions on which the City relies, the Union argues that even if those provisions may be construed as recognizing the City's authority generally to impose employee furloughs during a fiscal emergency, that authority is qualified by the phrase, "except as provided herein." (See *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1041-1042, fn. 35 [stating that a similar proviso in an MOU's management rights clause "suggests that the [management rights] clause was not intended to override all of the other, more specific

13

provisions of the MOU governing wages, hours, and other terms and conditions of employment."].)  The Union argues that because the MOUs contain a specific provision, article 5.1, requiring that covered employees "be compensated for 40 hours per week at the regular hourly rate for their class and pay grade," that provision establishes a specific exception to the city council's otherwise broad power to "take all necessary actions to . . . carry out its mission in emergencies."

Without question, the employee grievances at issue present a "dispute concerning the interpretation" of the MOUs.  Specifically, it is a dispute concerning interpretation of the MOUs' provisions generally establishing a 40-hour workweek, reserving to the City the right to "relieve City employees from duty," reserving to the City the right to "take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies," and allowing the City to exercise its reserved management rights "except as specifically set forth herein."  Because the dispute concerns the interpretation of the MOUs, it is one that the City is contractually obligated to arbitrate unless the dispute falls within an express exemption from arbitration.

## C.  Express Exemption From Arbitration

Arguing that the furloughs dispute is one that the MOUs expressly exclude from arbitration, the City relies once again on the management rights provision, article 1.9.  The City's argument has two major components.  First, the City again argues that by reserving its rights to "relieve City employees from duty because of . . . lack of funds" and to "take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies," article 1.9 recognizes and preserves its right to reduce labor costs during a fiscal emergency by imposing employee furloughs.  Second, the City argues that by expressly allowing employee grievances "about the *practical consequences* that decisions on

14

these matters may have on wages, hours, and other terms and conditions of employment" (italics added), article 1.9, by necessarily implication, prohibits employee grievances challenging the decisions themselves.  In summary, the City argues that because imposing employee furloughs during a fiscal emergency is a reserved management right, and because as to such reserved rights arbitration is limited to the consequences of the decision rather than the decision itself, the employees cannot challenge the City's furlough decision through arbitration.

The City's argument fails because the contractual language on which it relies as establishing an express exemption from its general obligation to arbitrate contractual interpretation disputes is not free from ambiguities and because resolving those ambiguities would draw us into the merits of the parties' underlying dispute.  Pertinent here is the United States Supreme Court's observation that "if courts, in order to determine arbitrability, were allowed to determine what is permitted [under a management rights clause] and what is not, the arbitration clause would be swallowed up by the exception."  (*Warrior & Gulf*, *supra*, 363 U.S. at p. 584.)  Of course, the City could enter into MOUs expressly excluding furlough disputes from arbitration, but the MOUs at issue here do not unmistakably and beyond any doubt provide for such an exclusion.  (See *id.* at p. 583 [In deciding whether a labor dispute is covered by a collective bargaining agreement's arbitration provision, "[d]oubts should be resolved in favor of coverage."].)  We agree with the United States Supreme Court that a court "should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator."  (*Id.* at p. 585.)

To support its position that article 1.9 makes the furloughs dispute inarbitrable, the City cites *Engineers & Architects Assn. v. Community*

15

*Development Dept.* (1994) 30 Cal.App.4th 644, in which the Court of Appeal construed a similar (perhaps identical) management rights clause to exclude from arbitration the City's decision to lay off a single employee "due to lack of work and/or lack of funds." (*Id.* at p. 648.) The employee's grievance asserted "that the action was unnecessary and hence unfair, that sufficient work and funds existed to provide for his position, and that no legitimate reason existed to warrant this action." (*Ibid.*) The union representing the employee conceded "the City's right to lay off employees because of a lack of work or funds." (*Id.* at p. 650.) The Court of Appeal held that the City was not required to arbitrate a dispute concerning the adequacy of the justification for the exercise of a reserved management right. (*Id.* at p. 655.)

The City asserts that the reasoning of that decision "applies fully to the case now before this Court." To the contrary, however, the decision is readily distinguishable. Here, the furloughs dispute is not about whether the City's decision to impose employee furloughs was necessary or unnecessary, fair or unfair, justified or unjustified. Rather, the dispute is about whether the City's decision to impose furloughs during a fiscal emergency involved the exercise of a reserved management right and whether it violated the wage and workweek provisions of the MOUs. As we have explained, such a dispute falls within the MOUs' arbitration provision.

The City presents some additional arguments in support of its contention that the furloughs dispute is inarbitrable. As we explain, none has merit.

### D. MOUs' Grievance Procedure as "Department Oriented"

The City argues that the six-step grievance procedure, as set forth in the MOUs, is aimed at resolving department-level disputes rather than citywide disputes concerning actions, such as furloughs, that are taken by the city council.

16

Because the grievance procedure is "department oriented," and because arbitration is part of this grievance procedure, the City argues, disputes regarding city council actions are inarbitrable.

No doubt the City is at least partly correct, in that *most* employee grievances involve department-level disputes concerning a single employee and the grievance procedure has therefore been designed primarily to efficiently and fairly resolve such disputes.[1] As mentioned above (see pp. 5, 10, *ante*), the MOUs, in article 3.1's section I(A), define "grievance" as "any dispute concerning the interpretation or application of this written MOU or departmental rules and regulations governing personnel practices or working conditions applicable to employees covered by this MOU." Under this definition, grievances can be divided into two categories: (1) disputes concerning "departmental rules and regulations governing personnel practices or working conditions," and (2) disputes "concerning the interpretation or application of this written MOU." Although disputes in the former category may properly be characterized as department level or department oriented, disputes in the latter category (especially those involving interpretation rather than merely application of the MOU) necessarily implicate the city council's authority because it is the council that has ratified the MOU, thereby contractually obligating the City to abide by its terms.

As support for its argument that *only* department-level disputes are arbitrable, the City cites *Service Employees Internat. Union v. City of Los Angeles* (1994) 24 Cal.App.4th 136 (*Service Employees*). There, Kenneth Thompson, an

---

[1] As the Union points out, however, the MOUs also expressly provide for grievances to be filed by a union when they affect more than one employee. (Art. 3.1, § II(C).) In such situations, one or more of the designated steps in the grievance process may be bypassed. (*Ibid*.)

employee within one city department (transportation), applied for a job in a different city department (general services). When he did not get the job, Thompson filed a grievance claiming that the proper personnel practices were not followed. (*Id.* at p. 138.) Thompson's supervisors in the transportation department rejected the grievance because they were not involved with the challenged decision, while the management-level officials in the general services department rejected the grievance because Thompson was not their employee. The Court of Appeal held that in this situation the City was not required to arbitrate the dispute because "the MOU does not compel arbitration of employees' disputes with departments other than those employing them." (*Ibid.*)

*Service Employees*, *supra*, 24 Cal.App.4th 136, has no application here. Unlike Thompson, the employees who have filed the grievances at issue here do not have disputes with departments other than the ones employing them. Rather, their grievances present a dispute concerning wages and hours in their current positions, a dispute that turns on the proper interpretation of the MOUs governing their employment. *Service Employees* does not establish that such a dispute is inarbitrable.

### E.  Absence of Express Waiver of Judicial Forum

The City argues that the dispute at issue is inarbitrable because the MOUs do not contain an express waiver of the City's right to a judicial forum for resolving disputes concerning the city council's statutory rights under the Charter and state law to manage the City's finances in an emergency. In support of this argument, the City relies on the United States Supreme Court's decision in *Wright v. Universal Maritime Service Corp.* (1998) 525 U.S. 70 (*Wright*). The argument fails, and *Wright* is distinguishable, because arbitration of the dispute here would not involve the resolution of any statutory claim.

18

In *Wright*, a longshoreman sued under the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq.), claiming that six stevedore companies had unlawfully discriminated against him by refusing to hire him after he settled a claim for permanent disability benefits for job-related injuries. (*Wright*, *supra*, 525 U.S. at pp. 72-75.) The federal district court dismissed the action because the longshoreman had failed to pursue arbitration of his claim under the terms of an applicable collective bargaining agreement. (*Id*. at p. 75.) The Fourth Circuit affirmed, but the United States Supreme Court reversed. (*Id*. at pp. 75-77.) In a unanimous opinion, the court held that statutory claims are not subject to a presumption of arbitrability (*id*. at p. 78) and that "a union-negotiated waiver of employees' statutory right to a judicial forum for claims of employment discrimination" must be " 'clear and unmistakable' " (*id.* at pp. 80-81).

The high court's decision in *Wright* does not assist the City here. The presumption of arbitrability was found to be inapplicable in *Wright* because the dispute at issue did not concern the application or interpretation of the collective bargaining agreement, but instead "the meaning of a federal statute." (*Wright*, *supra*, 525 U.S. at p. 79.) By contrast, the dispute at issue here entirely concerns the meaning of the MOUs' provisions, not the meaning or application of any statute or city charter provision. Because the dispute concerns the interpretation of the MOUs, there is no need or justification for requiring a clear and unmistakable waiver of the right to a judicial forum.

F. "The Ordinance"

The City argues that the MMBA allows a city to exempt certain subjects from the grievance process, that the City has done so by enacting "the Ordinance" (L.A. Admin. Code, § 4.800 et seq.), that the Ordinance's arbitration exemptions are incorporated into the MOUs, and that the Ordinance exempts from arbitration

19

the furloughs dispute at issue here.  This argument fails at the final step.  The City does not cite any provision of the Ordinance making the furloughs dispute here inarbitrable.

In support of the proposition that not all labor disputes are subject to resolution through a grievance process, the City cites the Ordinance's section 4.801 as limiting the grievance process to disputes "concerning the interpretation or application of a written [MOU] or of department rules and regulations governing personnel practices or working conditions."  This provision closely resembles the definition of "grievance," quoted above (see pp. 5, 10, 17, *ante*), in the MOUs at issue here.  As we have explained (see p. 14, *ante*), the dispute here *does* concern interpretation of the applicable MOUs, and thus it is not rendered inarbitrable by the Ordinance's section 4.801.

The City further argues that under the Ordinance grievances are limited to "issues resolvable by individual departments" and do not include "legislative acts of the City Council."  But the City cites no provision of the Ordinance so stating.  The Ordinance's section 4.880 states that the city council's "rights, powers and authority . . . shall not be modified or restricted" by the Ordinance, but binding MOUs necessarily restrict the city council's authority in the same way that any binding contractual obligation does.  Although the grievance procedure cannot be used to impose restrictions on the city council's authority in addition to those imposed by the MOUs themselves, it can be used to determine precisely what restrictions the city council has imposed on its own authority by ratification of those MOUs.

### G.  City Council Authority Under City Charter

The City contends that arbitration of the furloughs dispute "would annul, set aside or conflict with the city council's exclusive authority under the City

Charter to manage the City's finances." The City asserts that the issue here is similar to issues this court decided in *United Teachers*, *supra*, 54 Cal.4th 504. The City is wrong on both points.

In *United Teachers*, a school district approved conversion of an existing public school into a charter school, after which a teachers' union filed grievances claiming that the district had not complied with their collective bargaining agreement's provisions relating to charter school conversions. (*United Teachers*, *supra*, 54 Cal.4th at pp. 509-510.) When the grievances could not be otherwise resolved, the teachers sought to compel arbitration under the terms of their collective bargaining agreement. (*Id.* at p. 510.) This court held "that a court faced with a petition to compel arbitration to enforce collective bargaining provisions between a union and a school district should deny the petition if the collective bargaining provisions at issue directly conflict with the provisions of the Education Code — that is, if they would annul, replace, or set aside Education Code provisions." (*Ibid.*)

The City argues that this case is similar to *United Teachers*, *supra*, 54 Cal.4th 504, because the MOUs at issue here, if construed to preclude the imposition of employee furloughs during a fiscal emergency, would directly conflict with provisions of the Los Angeles City Charter. But the City does not show any such direct conflict. It does not identify any City Charter provision that the MOUs, if construed to prohibit employee furloughs, would annul, replace, or set aside. Indeed, the City cites only the City Charter provisions giving the city council discretionary salary-setting and budget-making authority.

In essence, the City's argument here is that construing the MOUs as prohibiting mandatory furloughs for employees covered by the MOUs, during the time covered by the MOUs, would impermissibly conflict with the City Council's

discretionary salary-setting and budget-making authority.  That argument fails for the reasons previously explained.  (See pp. 7-8, *ante*.)

### H.  Conclusion

Having found each of the City's arguments unpersuasive, we conclude that the City is contractually obligated under the MOUs to arbitrate the employee furloughs dispute at issue.

### DISPOSITION

The Court of Appeal's judgment is reversed.


KENNARD, J.

WE CONCUR:

CANTIL-SAKAUYE, C. J.
WERDEGAR, J.
LIU, J.

**DISSENTING OPINION BY CORRIGAN, J.**

I respectfully dissent. The majority does not honor the terms of the parties' agreement, and deprives the City of Los Angeles (the City) of its rightful authority to act in a fiscal emergency. I would affirm the Court of Appeal's judgment, but not for the reasons given by the court below. I agree with the majority that the City *could* have contracted to arbitrate the validity of a furlough program, without unlawfully delegating its discretionary authority over salaries and budgets. (Maj. opn., *ante*, at pp. 7-9.) However, the City and the Engineers & Architects Association (the Union) made no such agreement. To the contrary, they agreed that the City would retain the authority to relieve employees from duty due to lack of funds, with arbitration limited to the practical consequences of that decision. Only a specific contract provision could restrict the City's exercise of its prerogative. There is no such provision. Therefore, the decision to impose furloughs was a reserved management right, beyond the scope of arbitration.

The majority recognizes that the MOUs here do not authorize an arbitrator to determine whether particular disputes are arbitrable, and thus the scope of the contractual duty to arbitrate is a matter for judicial resolution. (Maj. opn., *ante*, at pp. 5, 9.) However, the majority then applies standards of review governing arbitration agreements in a manner that abdicates the judicial duty to determine that question. I agree that doubts are resolved in favor of arbitration, and that labor disputes are presumptively arbitrable. (Maj. opn., *ante*, at pp. 9-10.) But as

1

the majority acknowledges, "matters that the parties specifically exclude" from the scope of an arbitration agreement are not properly referred to an arbitrator. (*Steelworkers v. Warrior & Gulf Co.* (1960) 363 U.S. 574, 581 (*Warrior & Gulf*); see maj. opn., *ante*, at p. 10.)

These MOUs specifically exclude the parties' dispute from arbitration. The controlling language is found in article 1.9, titled "Management Rights": "As the responsibility for the management of the City and direction of its work force is vested exclusively in its City officials and department heads . . . , *except as specifically set forth herein* no provisions in this MOU shall be deemed to limit or curtail the City officials and department heads in any way in the exercise of the rights, powers and authority which they had prior to the effective date of this MOU. . . . [T]hese rights, powers, and authority include but are not limited to, the right to . . . relieve City employees from duty because of lack of work, lack of funds or other legitimate reasons, . . . [and to] take all necessary actions to maintain uninterrupted service to the community and carry out its mission in emergencies; provided, however, that the exercise of these rights does not preclude employees and their representatives from consulting or raising grievances about the practical consequences that decision on these matters may have on wages, hours, and other terms and conditions of employment." (Italics added.)

The import of this contract language is unmistakable. The MOUs reserve to the City certain fundamental management rights, "exclusively vested" in city officials. (Art. 1.9.) No MOU provision, including the arbitration clause, may "limit or curtail" the exercise of these rights, except as specifically provided in the agreement. (*Ibid*.) The enumerated management rights include the authority to relieve employees from duty due to lack of funds, and to "take all necessary actions" to preserve city services in emergencies. (*Ibid*.) Furloughs entail relieving employees from duty, reducing hours and wages to conserve funds in a

2

fiscal emergency.  Thus, they are squarely within the City's reserved management authority, absent a specific limitation in the MOUs.  Employees may invoke the grievance process set out in the MOUs only as to the practical effects of an exercise of management rights.

The majority does not come to grips with the terms of article 1.9.  It identifies no contract provision specifically limiting the City's right to relieve employees from duty in a fiscal crisis.  Instead, it summarily asserts that the contract language is "not free from ambiguities," and reasons that applying the exclusion in the management rights provision would draw us into the merits of the dispute and swallow up the arbitration clause.  (Maj. opn., *ante*, at p. 15.)  These concerns are misplaced.  Before turning to the question of ambiguity, I address the ideas that we should avoid reaching the merits, and that giving effect to the management rights provision would devour the arbitration clause.

We are properly concerned with the merits when the parties' dispute is about arbitrability.  "For arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit. Yet, to be consistent with congressional policy in favor of settlement of disputes by the parties through the machinery of arbitration, the judicial inquiry . . . must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance . . . ."  (*Warrior & Gulf*, *supra*, 363 U.S. at p. 582.)  Here our inquiry is strictly confined to whether the City agreed to allow an arbitrator to decide if it could impose furloughs in a fiscal emergency.  While "[d]oubts should be resolved in favor of" arbitration (*id*. at p. 583), that does not mean we are meddling in the merits by construing the exclusion in the management rights clause.  We have said that "judicial enthusiasm for alternative methods of dispute resolution must not in all contexts override the rules governing the interpretation of contracts."  (*Victoria v. Superior Court* (1985) 40 Cal.3d 734, 739.  " '[T]he

3

policy favoring arbitration cannot displace the necessity for a voluntary *agreement* to arbitrate.' [Citations.]" (*Ibid*.; see also, e.g., *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 537. )

Nor is this a case where a management rights clause threatens to swallow an arbitration clause. These MOUs do not, as in the *Warrior & Gulf* case, generally declare that " 'matters which are strictly a function of management shall not be subject to arbitration.' " (*Warrior & Gulf*, *supra*, 363 U.S. at p. 583.) The City is bound by all restrictions "specifically set forth" in the MOUs, which provide ample grounds for arbitrable disputes. (Art. 1.9.) The danger here is that a broad reading of the arbitration clause will override the exclusions stated in the management rights clause. The provision limiting grievances over the exercise of a management right to the practical effects on working conditions has no meaning if every dispute over management rights is arbitrable.

That said, the majority properly recognizes that an express exemption from arbitration relieves the City from the obligation to arbitrate. (Maj. opn., *ante*, at p. 14.) However, the majority does not apply or even examine the express exemption in the management rights clause. It deems the clause "not free from ambiguities," but points to no ambiguous term. (*Id*. at p. 15.) It would be difficult to do so, because the contract language is not ambiguous. The parties agreed that the City would have broad authority to act in fiscal emergencies, subject only to specific contract limitations. There are none that preclude furloughs.

The Union attempts to find a limitation against furloughs in article 5.1, which governs work schedules. However, the language noted by the Union is restricted to the special situation of employees working long days in exchange for extra days off. The fourth paragraph of article 5.1 states: "Employees on a four/ten work schedule shall work ten hours per day for a four day work week (or twelve hours per day for a three day work week in the Information Technology

4

Agency only) exclusive of lunch periods.  Employees shall be limited to rest periods in accordance with the provisions of Article 4.4.  *Employees shall be compensated for 40 hours per week at the regular hourly rate for their class and pay grade*."  (Italics added.)

This provision cannot reasonably be transformed into a restriction against furloughs.  It clarifies the rate of compensation for employees working the unorthodox schedules mentioned earlier in the paragraph.  In the first paragraph of article 5.1, which addresses more generally the subject of wages and hours, the parties agreed that the City could "assign employees to work a four/ten, five/forty, nine/eighty *or other work schedule*."  (Italics added.)  They also agreed that "[m]anagement may require employees *to change their work schedules* (*working hours* or change days off, except the split day) . . . providing that the change is not arbitrary, capricious or discriminatory."  (Art. 5.1, italics added.)  This paragraph goes on to contemplate arbitration over whether a schedule change is arbitrary, capricious, or discriminatory.  The Union makes no such claim; it argues only that furloughs are unauthorized.   However, nothing in article 5.1 limits the City's authority to implement furloughs.  Indeed, the first paragraph of the article contemplates considerable flexibility in the exercise of management's power to set schedules.

The Union also refers to article 6.1 of the MOUs, which provides salary schedules consisting of 40-hour weeks.  Here again, no guarantee of a 40-hour week is implied.  The salary schedules establish norms, which are used not only for ordinary work schedules but also to calculate pay for employees working overtime or reduced hours.  They are not a specific limitation on the City's authority to relieve employees from duty in a fiscal emergency.

The Union claims the management rights provision itself is ambiguous, citing a footnote in *Professional Engineers in California Government v.*

5

*Schwarzenegger* (2010) 50 Cal.4th 989, 1041-1042, fn. 35 (*Professional Engineers*). The footnote consists entirely of dicta, and its discussion is inapposite here. *Professional Engineers* addressed "State's Rights" MOU clauses that the trial court had found persuasive with respect to the Governor's power to furlough state employees. We decided that even if the court had erroneously interpreted these clauses to permit furloughs, it would not affect our ultimate determination that the Legislature effectively ratified and validated the Governor's furlough program. (*Professional Engineers*, at pp. 1041-1042.) Nevertheless, we commented as follows:

"One of the 'State's Rights' clauses upon which the trial court relied was section 3.1.B of the MOU between the state and plaintiff CASE. That section of the CASE MOU provides in full: 'To the extent consistent with law and this MOU, the rights of the State include, but are not limited to, the exclusive right to determine the mission of its constituent departments, commissions, and boards; set standards of service; train, direct, schedule, assign, promote, and transfer its employees; initiate disciplinary action; relieve its employees from duty because of lack of work, lack of funds, or for other legitimate reasons; maintain the efficiency of State operations; determine the methods, means and personnel by which State operations are to be conducted; take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work. The State has the right to make reasonable rules and regulations pertaining to employees consistent with this MOU provided that any such rule shall be uniformly applied to all affected employees who are similarly situated.'

"The trial court pointed to the language in this section permitting the state to 'relieve its employees from duty because of lack of work, lack of funds, or for other legitimate reasons,' but failed to take note of the introductory clause of

6

section 3.1.B —'[t]o *the extent consistent with* law and *this MOU*' (italics added) — which suggests that the 'State's Rights' clause was not intended to override all of the other, more specific provisions of the MOU governing wages, hours, and other terms and conditions of employment. Moreover, the clause recognizing the state's right to relieve its employees from duty because of 'lack of funds' — the clause relied upon by the trial court — reasonably can be interpreted to refer only to the state's authority, under [Government Code] section 19997, to lay off employees for lack of funds. As will be recalled, section 19997 is one of the few statutes dealing with the terms and conditions of employment that is not subject to supersession under the Dills Act. (See, *ante*, at pp. 1034–1035, fn. 29.)

"Two separate provisions of the MOU in question (§§ 10.2, 10.3) explicitly address the question of furloughs. Section 10.2 provides in relevant part that '[w]henever the State determines it is necessary to lay off employees, the State and the Union shall meet in good faith to explore alternatives to laying off employees such as . . . *voluntary* reduced work time . . . .' (Italics added.) Section 10.3 provides that '[t]he State may propose to reduce the number of hours an employee works as an alternative to layoff. Prior to the implementation of this alternative to a layoff, the State will notify and meet and confer with the Union to seek concurrence of the usage of this alternative.'

"The trial court's ruling does not appear to give adequate consideration to these specific provisions of the MOU, or to assess how these provisions reasonably should be interpreted in light of the common understanding (at the time the parties entered into the MOU) of the Governor's authority or lack of authority to impose such furloughs. (See, e.g., *Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal.App.3d 615, 623 [ordinary 'custom and usage' must be considered in interpreting the terms of an MOU].) In light of all of these circumstances, the trial court's reliance upon the 'State's Rights' clauses in the

7

MOU's is at the least open to serious question." (*Professional Engineers*, *supra*, 50 Cal.4th at pp. 1041-1042, fn. 35.)

The distinctions between the MOU provisions quoted in *Professional Engineers* and those before us here are substantial and determinative. Rather than granting the City the power to relieve employees from duty due to lack of funds " '[t]o *the extent consistent with . . . this MOU*' " (*Professional Engineers*, *supra*, 50 Cal.4th at p. 1042, fn. 35), here the parties agreed that "*except as specifically set forth herein* no provisions in this MOU shall be deemed to limit or curtail the City . . . *in any way*" in the exercise of its right to relieve employees from duty in a fiscal emergency (art. 1.9, italics added). Instead of restricting management to actions consistent with MOU terms, these MOUs provide the City with reserved powers limited only by specific contract terms. That is a significant difference. An action not specifically barred is permitted, even if it is arguably inconsistent with general MOU terms.

Furthermore, no provision in these MOUs contemplates furloughs as an alternative to layoffs, or imposes a meet-and-confer requirement before hours are reduced, as was the case in *Professional Engineers*. The parties anticipated voluntary furloughs upon the agreement of individual employees and management, without mentioning layoffs. Article 5.3 of the MOUs provides: "[W]henever a full-time employee voluntarily reduces the number of his/her biweekly regular hours from eighty (80) to a number not less than seventy-two (72) at the request of, or with the permission of, his/her appointing authority, such employee shall be credited with all rights and benefits as though he/she worked eighty (80) hours in the payroll period. The employee shall not be credited for overtime worked until more than forty (40) hours have been worked in the workweek. Compensation received under this Article shall be considered full

8

compensation for all employees participating in the voluntary work hour reduction."

Nothing in this voluntary furlough provision limits the City's authority to impose mandatory furloughs, or raises a doubt as to whether the contract term "relieve City employees from duty because of . . . lack of funds" refers to furloughs or layoffs. (Art. 1.9.) Here the term includes both alternatives, unless there is a specific limitation elsewhere in the MOUs. But Article 5.3 governs only voluntary reductions in hours by employees. It does not implicate the City's reserved unilateral authority to act in a fiscal emergency.

For all these reasons, what we said in *Professional Engineers* does not control the interpretation of the MOUs in this case. These parties agreed that the City's power to relieve employees from duty due to lack of funds, and to take all necessary actions in emergencies, was limited only as specifically set forth in the MOUs. (Art. 1.9.) They agreed that the City could impose "other work schedule[s]" than the alternatives set out in the MOUs, and could change employees' work hours in ways not arbitrary, capricious, or discriminatory. (Art. 5.1.) While the parties contemplated 40-hour workweeks at regular rates of pay as the norm, they did not *require* 40-hour workweeks. (Arts. 5.1, 6.1.) Nor did they specify that if furloughs were to be imposed in lieu of layoffs, it would be on a voluntary basis.

The Union was free to bargain for a narrower management rights clause. Or, accepting the terms of article 1.9, it could have negotiated for specific protections against furloughs. It did neither of those things. Like any party to a contract, it ought to be bound by the terms to which it agreed. The majority's failure to enforce this agreement is unfortunate. An important question of public policy and a matter of considerable budgetary significance is committed to the discretion of an unelected arbitrator, whose decision is unreviewable. (*Moncharsh*

9

*v. Heily & Blase* (1992) 3 Cal.4th 1, 11.) The City does not seek to insulate its decision from oversight. It is willing to submit to judicial review, under a deferential standard appropriate to actions taken by local government in response to a fiscal emergency. (See *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 667-670.) We should give the Union its day in court, and not subject the decisions of elected leaders in difficult times to second-guessing by an arbitrator who is not answerable to the voters.

**CORRIGAN, J.**

**WE CONCUR:**

**BAXTER, J.**

**CHIN, J.**

10

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City of Los Angeles v Superior Court

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 193 Cal.App.4th 1159
**Rehearing Granted**

_____

**Opinion No.** S192828
**Date Filed:** June 20, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Gregory Wilson Alarcon

_____

**Counsel:**

Carmen A. Trutanich, City Attorney, Zna Portlock Houston, Assistant City Attorney, Janis Levart Barquist and Jennifer Maria Handzlik, Deputy City Attorneys, for Petitioner.

Akins Gump Strauss Hauer & Feld, Rex S. Heinke and Jessica M. Weisel for Los Angeles Chamber of Commerce as Amicus Curiae on behalf of Petitioner.

Kronick, Moskovitz, Tiedemann & Girard, David W. Tyra and Meredith Packer Garey for League of California Cities and California State Association of Counties as Amici Curiae on behalf of Petitioner.

Kamine Phelps and Marcia Haber Kamine for Engineering Contractors' Association as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Carroll, Burdick & McDonough, Gary M. Messing, Gregg McLean Adam, Jonathan Yank, Gonzalo C. Martinez; Levy, Stern, Ford & Wallach, Myers Law Group, Adam N. Stern and Lewis N. Levy for Real Party in Interest.

Leonard Carder and Arthur A. Krantz for International Federation of Professional and Technical Engineers, Local 21, Public Employees Union Local One, State Employees Trades Council-United, University Council-American Federation of Teachers, Academic Professionals of California, University Professional and Technical Employees, CWA Local 9119 and Marin Association of Public Employees as Amici Curiae on behalf Real Party in Interest.

**Counsel:**

Silver, Hadden, Silver, Wexler & Levine and Stephen H. Silver for Los Angeles Police Protective League, San Francisco Police Officers' Association, CDF Firefighters, California Correctional Peace Officers' Association, Ventura County Deputy Sheriffs' Association, San Bernardino County Safety Employees' Benefit Association, Deputy Sheriffs' Association of Santa Clara County, Los Angeles County Professional Peace Officers' Association (PPOA), Fresno Deputy Sheriffs' Association, Santa Monica Police Officers' Association, Manhattan Beach Police Officers' Association, Anaheim Firefighters' Association, Costa Mesa Firefighters' Association, Inc., Huntington Beach Firefighters' Association, Fullerton Firefighters' Association, Orange City Fire Fighters, Inc., Orange County Employees' Association and Peace Officers Research Association of California Legal Defense Fund Amici Curiae on behalf of Real Party in Interest.

Rothner, Segall & Greenstone, Anthony Segall, Ellen Greenstone, Jonathan Cohen and Anthony P. Resnick for American Federation of State, County and Municipal Employees, District Council 36, International Union of Operating Engineers Local 501, Laborers International Union of North America, Local 777, Los Angeles/Orange Counties Building and Constructions Trades Council and Service Employees International Union, Local 721 as Amici Curiae on behalf of Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Janis Levart Barquist
Deputy City Attorney
200 North Main Street, 800 City Hall East
Los Angeles, CA  90012
(213) 978-7151

Jennifer Maria Handzlik
Deputy City Attorney
200 North Main Street, 800 City Hall East
Los Angeles, CA  90012
(213) 978-7151

Gregg McLean Adam
Carroll, Burdick & McDonough
44 Montgomery Street, Suite 400
San Francisco, CA  94104
(415) 989-5900