Filed 12/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JANE DOE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MASSAGE ENVY FRANCHISING, LLC,<br><br>    Defendant and Appellant. | A161688<br><br>(San Mateo County<br>Super. Ct. No. 19CIV00392E) |

Plaintiff Jane Doe alleges that she was sexually assaulted by a massage therapist during a massage at a Massage Envy retail location in San Rafael, California. She filed a lawsuit for damages against the Arizona-based franchisor that licenses the "Massage Envy" brand name (Massage Envy Franchising, LLC, or MEF), and the independently owned "Massage Envy" branded franchise location in San Rafael where the assault allegedly occurred.

MEF (the franchisor) moved to compel arbitration on the basis of a "Terms of Use Agreement" presented to plaintiff when she checked in for a massage she had booked at the San Rafael franchise location. The trial court concluded that there was no agreement to arbitrate between plaintiff and MEF, and denied the motion.

In this appeal from the trial court's order, MEF argues that the "Terms of Use Agreement," which was available to plaintiff via hyperlink on the electronic tablet she was given at the franchise location to check in for her

1

massage, is a valid and enforceable "clickwrap" agreement of the sort that courts routinely enforce. We disagree. In the circumstances here, plaintiff did not have reasonable notice that she was entering into *any* agreement with MEF, much less notice of the terms of the agreement. We shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts are undisputed.

Sometime before August 7, 2017, plaintiff entered into a "Wellness Agreement" with an independently owned Massage Envy franchisee located in San Rafael. The Wellness Agreement was in essence a membership that, in exchange for a monthly fee, entitled plaintiff to one massage per month and a reduced rate on any additional massages. The Wellness Agreement continued month-to-month until cancellation by plaintiff. It did not mention arbitration. Plaintiff was a "member" of San Rafael Massage Envy for several years without incident.

A.     *Plaintiff Checks in for a Massage on August 7, 2017*

On August 7, 2017, plaintiff had an appointment for a massage at San Rafael Massage Envy. Before the start of her massage, a staff member handed her an electronic tablet and asked her to quickly check in. The check-in process, as we will describe, involved completing two electronic forms.

MEF acknowledges that as of August 7, 2017, it had no pre-existing relationship with plaintiff. However, MEF asserts that the August 7 check-in process involved use of an "In-Store Application" that MEF had developed for its franchisees, including San Rafael, and that in the course of checking in for her massage by means of the tablet, plaintiff executed a contract with MEF. But no one at the San Rafael location told plaintiff that in using the tablet to check in she would be using an "In-Store Application" that MEF had

developed, or entering into a binding agreement with MEF, an entity with which she had no relationship.

We describe in some detail the tablet screens that were presented to plaintiff during the check in process.

The first screen plaintiff saw had a bright teal-blue header with a white "ME" logo and three pale teal-blue headings across the top of the screen: "Welcome," "Massage," and "My Consent." This screen, entitled "Before We Get Started" in bright purple, stated: "We want to make sure your account information is tidy and up-to-date. Take a second to update anything and fill in the missing fields!" The fields for plaintiff's name, address, and contact information were either pre-populated, or plaintiff filled them in.

Upon tapping a bright purple button labeled "Continue," plaintiff saw the next screen with the header "Welcome" in white with a white bar below it. This screen was entitled "Welcome [plaintiff's name]" shown in large, bright purple letters. Below that, under the heading "Massage Envy & You," was the following: "We know that each body is unique and should be treated as such. We allow you to customize your service to make sure you have the safest and most relaxing session possible. Just tap on the button below to begin your forms!" Directly below were icons for two forms: one called "My Massage" and the other "General Consent." And directly under that was a bright purple button labeled, "View My Forms." There is no reference to a separate "Terms of Use Agreement," let alone an arbitration agreement.

After tapping the "View My Forms" button, plaintiff was presented with a series of screens with the word "Massage" in white in the heading above the title "My Massage," in large bright purple letters. On these "Massage" screens, plaintiff was instructed to "tap your areas of stress and pain," indicate whether she was "comfortable receiving therapeutic massage"

3

on various depicted areas of her body, identify her "Daily Activities," answer questions about her "Lifestyle," and complete a scroll-down form (apparently five screens long) called "My Health History."

At the end of the health history, plaintiff tapped a check-box indicating she was 18 or older, and then, upon tapping a bright purple button labeled "Continue," she was presented with a screen with the words "My Consent" in white in the heading and the title "My Consent" in large bright purple letters. This corresponded to the second of the two "my form" icons shown on an earlier screen.. Under the title was a scroll-down document (in a small black font, single-spaced on a white background, apparently about five screens long) entitled "General Consent," which began, "Please read and review in full to sign below." There followed a bold-face heading, "Assumption of Risk, Release, Waiver of Liability, and Indemnification," and a paragraph that began, "By signing below, you understand, acknowledge, agree . . . that the information provided by you on this Wellness Chart may be shared with and utilized by any Message Envy location for the purpose of providing you services at any Massage Envy location you choose. . . ." The second paragraph of the General Consent stated, again, "Please read and review in full to sign below." The third paragraph stated, "The words 'you' and 'your' mean the Member listed above (and the Buyer signing below with respect to payment). The words we, our, and us refer to NIKHIL, Inc., d/b/a Massage Envy San Rafael, an independently owned and operated Massage Envy® Franchise. The information provided to us by you in this application shall be collectively referred to as your 'Wellness Chart.' " Additional paragraphs followed.

What stands out about the "General Consent" is that it was an agreement between plaintiff and *San Rafael Massage Envy*, identified as an

4

"independently owned and operated Massage Envy® franchise." In other words, where plaintiff had gone for her massage. Also notable is that the General Consent did not define or identify MEF, though it did mention "MEF" as an entity that was *not* providing plaintiff with massage services or employing therapists or estheticians, and that was being released from liability.

Near the end of the General Consent form and in what appears to be the same size and font used in the text of the General Consent, plaintiff was presented with a line of text that read, "I agree and assent to the <u>Terms of Use Agreement,</u>" next to a check-box. Below that, and still within the scroll-down General Consent form, was a blank signature line and date line, and below that a bright purple button labeled "Continue."

The words "Terms of Use Agreement" were apparently in gray (lighter than the black text of the General Consent and lighter than the preceding words, "I agree and assent to the"). The words "Terms of Use Agreement," underlined in light purple, were a hyperlink that, if clicked, would have displayed a scroll-box that allows the user to read a document that is actually entitled "Terms and Conditions." This was the only hyperlink presented to plaintiff in the course of her check-in.

Under pressure from staff to complete the forms and check in quickly, plaintiff did not realize that there was a hyperlink to the Terms and Conditions. Plaintiff checked the box stating she agreed and assented, but she was not prompted or required to click on that hyperlink, and she did not. Plaintiff signed her name on the signature line on the tablet, tapped the bright purple "Continue" button, and was shown a screen thanking her by name and informing her that her therapist would be with her shortly.

5

In contrast with the General Consent form, Plaintiff was not required to scroll through the Terms and Conditions, and she did not see the Terms and Conditions when she checked in on August 7. If she had clicked on the hyperlink, she would have seen an agreement which, when printed in its entirety on standard size paper with standard margins, runs to 10 single-spaced pages. In the Terms and Conditions, just below the title was a paragraph in boldface capitals stating, "Important Notice: This terms of use agreement ("Agreement") contains a binding arbitration provision and a class action waiver. Please read it carefully because it affects your legal rights as detailed in the binding individual arbitration section below." The arbitration provision occupied three full pages of single-spaced text, starting on page four of the Terms and Conditions.

B.    *The Lawsuit*

Plaintiff alleges that in the summer of 2017 she was sexually assaulted by a massage therapist during a massage at the San Rafael Massage Envy location. She alleges that she reported the assault, but no investigation was made, and that this was in keeping with an alleged cover-up of a widespread problem of women being sexually assaulted by massage therapists at Massage Envy franchise locations.

Plaintiff sued MEF and the San Rafael Massage Envy location for damages based on causes of action including sexual battery and fraud. MEF moved to compel arbitration on the ground that plaintiff assented to the "Terms and Conditions," including its arbitration provision, by checking the box next to the statement "I agree and assent to the Terms of Use Agreement." The trial court concluded there was no agreement to arbitrate between plaintiff and MEF and denied MEF's motion. The trial court alternatively denied the motion based on its determination that the claims

6

asserted against MEF were not within the scope of the arbitration provision in the Terms and Conditions, and that such a determination was properly made by the court.

MEF timely appealed.[1]

## DISCUSSION

A.     *Applicable Law*

Although there is a strong public policy favoring arbitration, the policy has no application to parties who have not agreed to arbitrate their disputes. (*Ramos v. Westlake Services, LLC* (2015) 242 Cal.App.4th 674, 685 (*Ramos*); see also *Bono v. David* (2007) 147 Cal.App.4th 1055, 1063 (*Bono*) [" ' " 'there is no policy compelling persons to accept arbitration of controversies which they have not agreed to arbitrate' " ' "].)  As the party seeking to compel arbitration, MEF has the burden to prove the existence of a valid arbitration agreement by a preponderance of the evidence.  (*Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 413.)

We apply California contract law in deciding whether parties have entered a binding agreement to arbitrate.[2]  (*Ramos*, *supra*, 242 Cal.App.4th at p. 685.)  Under California law, a contract will not exist without the mutual consent of the parties (Civ. Code, §§ 1550, 1565), which requires that the parties "all agree upon the same thing in the same sense."  (*Id.* § 1580.) " ' "The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent

---

[1] The owner of the franchise location is not a party to this appeal.

[2] Plaintiff argues that California law applies to the question whether there is a valid agreement to arbitrate.  MEF notes that the Terms of Use Agreement contains an Arizona choice-of-law provision, but analyzes the contract formation issue under California law.

7

would lead a reasonable person to believe.  [Citation.]  Accordingly, the primary focus in determining the existence of mutual consent is upon the acts of the parties involved." ' " (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 789.)  What matters is "the reasonable meaning of the words and acts of the parties," and not "their unexpressed intentions or understanding." (1 Witkin, Summary of Cal. Law (11th ed. 2022) Contracts, § 116.)

It has long been the law in California that "an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." (*Windsor Mills, Inc. v. Collins & Aikman Corp.* (1972) 25 Cal.App.3d 987, 993.)  This principle "applies with particular force to provisions for arbitration." (*Ibid.*)

Where paper contracts are concerned, "the outward manifestation of assent to the *same thing* by both parties is often readily established by the offeree's receipt of the physical contract." (*Sellers v. JustAnswer LLC* (2021) 73 Cal.App.5th 444, 461.)  But when transactions occur electronically, as here, "the consumer is not typically provided a physical copy of the contractual terms.  In that context, and in the absence of actual notice, a manifestation of assent may be inferred from the consumer's actions . . . including, for example, checking boxes and clicking buttons—but any such action must indicate the parties' assent to the *same thing* which occurs only when . . . the contractual terms were presented to the consumer in a manner that made it apparent the consumer was assenting to those very terms when checking a box or clicking on a button." (*Ibid.*)  When a contract is presented to a consumer on a computer screen, "the *full context of any transaction is critical* to determining whether any particular notice is sufficient to put a

consumer on inquiry notice of contractual terms contained on a separate hyperlinked page." (*Id.* at p. 454, italics added.)

Where the facts are not in dispute and the trial court has denied a petition to compel arbitration based on its determination that there is no agreement to arbitrate, our review is de novo. (*Bono, supra,* 147 Cal.App.4th at pp. 1061-1062.)

B.    *Analysis*

The question before us is whether plaintiff entered into an agreement with MEF to arbitrate her claims. Our answer is no.

First, when plaintiff checked in for her massage at San Rafael Massage Envy on the day in question, she had no reason to believe that the check-in process or her massage involved MEF. She had a pre-existing contractual relationship (the "Wellness Agreement") with the San Rafael location, to which MEF was not a party.[3] The check-in process on August 7 began with a screen acknowledging the relationship she had with *San Rafael Massage Envy*: "We want to make sure your account information is tidy and up-to-date." And consistent with that contractual relationship, the two forms ("My Forms") that were presented to plaintiff on the tablet were about her relationship with the San Rafael location. The "My Massage" form specified the nature of the massage she agreed to receive from the San Rafael massage therapist. And the "My Consent" form, specifically the General Consent, was consent for services she was about to receive from the San Rafael location, not from MEF. Nothing about the process suggested that checking in for the massage involved entering a new, and continuing, relationship with MEF.

---

[3] MEF represents that the Wellness Agreement states that MEF is a franchisor and not a party to the Wellness Agreement or responsible for the acts of the franchised location. It is not part of the record.

Second, plaintiff had no reason to believe that the terms of "My Consent" involved anything other than the "assumption of risk, release, waiver of liability, and indemnification." When she was presented with the check-box next to "I agree and assent to the <u>Terms of Use Agreement</u>," she had just finished scrolling through the General Consent, a contract with repeated instructions to read and review it in full and to sign it, as well as repeated statements that she was agreeing, consenting to, acknowledging, and accepting the terms of the "Assumption of Risk, Release, Waiver of Liability, and Indemnification." Everything about the check-box next to the words "I agree and assent to the <u>Terms of Use Agreement</u>" made it appear to be simply a part of the General Consent. The check-box lies within the body of the General Consent, just *below* a paragraph stating that plaintiff "acknowledge[s] and agree[s] that [her] consent to this assumption of risk, release, waiver of liability and indemnification is given in exchange for our rending of services . . ." and just *above* the signature line. Because of the placement of the check-box and in the context of the screens plaintiff had just reviewed, clicking the check-box appeared to be part of the process of reviewing, signing, and agreeing to the General Consent between her and the San Rafael Massage Envy location, rather than as an indication of assent to an entirely different contract with an entirely different entity.

In short, we have no difficulty concluding that the contractual terms of the Terms and Conditions—including the arbitration provision—were not presented to plaintiff "in a manner that made it apparent [she] was assenting to those very terms when . . . clicking on a button" next to the sentence "I agree and assent to the Terms of Use Agreement." (*Sellers*, *supra*, 73 Cal.App.5th at p. 461.) To the contrary, the entire check-in experience made it appear that by clicking that button and then signing her name plaintiff

10

was agreeing to the General Consent, a contract to which she and San Rafael Massage Envy were the parties.  In these circumstances, she did not enter any agreement with MEF.

MEF contends that plaintiff executed an enforceable agreement with MEF to arbitrate because the "Terms of Use Agreement" is an enforceable "clickwrap" agreement " 'in which website users are required to click on an "I agree" box after being presented with a list of terms and conditions of use.' " (*Long v. Provide Commerce, Inc.* (2016) 245 Cal.App.4th 855, 862, quoting *Nguyen v. Barnes & Noble Inc.* (9th Cir. 2014) 763 F.3d 1171, 1175-1176.) *Sellers*, *supra*, 73 Cal.App.5th at page 463, defines a "clickwrap" agreement as " 'one in which an internet user accepts a website's terms of use by clicking on an "I agree" or "I accept" button, with a link to the agreement readily available.' "  *Sellers* explains that clickwrap agreements were developed as consumers began downloading software from websites, as opposed to buying actual packages that contained the software on disks.  Because "there was no way for providers to include a physical copy of the contractual terms [with a download,] providers would ask customers to agree to the terms, displayed somewhere on their website, by clicking on an ' "I accept" ' or ' "I agree" ' button." (*Ibid.*)  "In most instances, the contractual terms were not actually displayed on the same screen as the ' "I accept" ' button, but were instead provided via a hyperlink that, when clicked, took the user to a separate page displaying the full set of terms." (*Ibid.*)

But the transaction in which plaintiff purportedly agreed to the MEF's "Terms of Use Agreement" is nothing like the typical transactions in which clickwrap agreements are used, as reflected in the description above.  For one thing, there is no evidence before us that plaintiff was using a website to check in for her massage, or, if she was using a website, that she was so

11

informed.  She did not use an internet browser to navigate to a website or make an online purchase.  As far as she knew, she was not involved in a transaction of any sort with MEF.  Instead, she went to a physical location in San Rafael, where she was already a member, and where she had an appointment for a massage under her monthly membership contract.  When she arrived, she was handed a tablet to check in for that massage.

According to MEF, its "Terms of Use Agreement" is enforceable as a clickwrap agreement because plaintiff was on constructive notice of its terms: she was presented with the contract by means of a "conspicuous hyperlink" and manifested her assent by clicking the check-box.  We disagree that the hyperlink was conspicuous.  The hyperlink was, in fact, inconspicuous.  It was placed in a sentence next to a check-box within the General Consent document without any instruction to read and review a new document, and therefore appeared to refer to the terms that had already been presented over the course of several screens.  Plaintiff had been twice instructed to read and review the General Consent, but there was no instruction to read and review any new document.  The sentence containing the hyperlink to the Terms of Use Agreement was not presented in boldface, even though boldface was used to highlight portions of the General Consent document.  And the hyperlink was not presented by means of a bright purple button, like the "Continue" buttons, nor was plaintiff presented with other hyperlinks in the course of her check-in process, which might have suggested she should take some further steps before clicking on the button marked with a check to indicate her agreement.

And there was nothing special about the check-box, either:  it looks just like the other check-boxes that plaintiff had encountered earlier during the

check-in process while she was filling out her health history.  None of those check-boxes were associated with hyperlinked text.

Nor did the check-in process call any attention to the existence of a third form or document for plaintiff to review, beyond the two identified forms:  My Massage and General Consent.  The "Terms of Use Agreement" was never called out or identified, until it was referenced in an inconspicuous hyperlink at the end of the General Consent form right above the signature line.  Plaintiff was not presented with language during the check-in process stating that if she did not wish to be bound by the Terms and Conditions she could not check in for her massage.  (See *Net2Phone, Inc. v Superior Court* (2003) 109 Cal.App.4th 583, 586 (*Net2Phone*) [enforcing forum selection provision in hyperlinked contract where website informs user that to access the site user must agree to be bound by terms of use, and states, " '[i]f you do not wish to be bound by these Terms of Use, you may not access or use' " the site, materials, or services].)  Plaintiff was not advised that before she could check in for her massage, she had to read the Terms and Conditions.  (See *Applebaum v. Lyft, Inc.* (S.D.N.Y. 2017) 263 F.Supp.3d 454, 469-470 [granting petition to compel arbitration where customer assented to contract terms by clicking " 'I accept' " after reviewing screen stating " 'Before you can proceed you must read & accept the latest Terms of Service,' " and where "Terms of Service were set out on the screen to be scrolled through"].)

As we have explained, in its context, the statement that plaintiff was agreeing to terms of use appeared to refer to the terms that had already been presented to her over the course of several screens, and clicking the check-box appeared to be just an extra confirmation of her agreement before she signed the General Consent document.  Having reviewed the General Consent, as instructed, plaintiff had no reason to look for any other agreement to review,

13

and she was not on notice that clicking the check-box implicated any terms and conditions beyond those she had just reviewed. Particularly not any agreement with MEF, in view of the fact that the "General Consent" is clear that the agreement is *only* between plaintiff and the San Rafael location. As the Court of Appeal observed in *Sellers*, " ' "consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." ' " (*Sellers*, *supra*, 73 Cal.App.5th at p. 476.) "This is particularly true when the transaction is one in which the typical consumer would not expect to enter into an ongoing contractual relationship . . . . [A] consumer that does not expect to be bound by contractual terms is less likely to be looking for them." (*Ibid*.) Plaintiff here had no reason to expect that checking in for her massage at the San Rafael Massage Envy would involve her entering into any ongoing contractual relationship of any sort with MEF, an entity that was a stranger to her. This is not a case like *B.D. v. Blizzard Entertainment, Inc.* (2022) 76 Cal.App.5th 931. There, the consumer had accessed an online platform to interact with other players in a videogame, which he spent about 50 hours playing over the course of about two years. (*Id.* at pp. 950-951.) Circumstances like that, unlike the circumstances here, " 'involve a consumer signing up for an *ongoing* account and thus, it is reasonable to expect that the typical consumer in that type of transaction contemplates entering into a continuing, forward-looking relationship' governed by terms and conditions." (*Id.* at p. 951, quoting *Sellers, supra*, 73 Cal.App.5th at p. 471 and adding italics.)

In arguing that the arbitration clause in the Terms and Conditions is enforceable, MEF relies on cases where courts applied California law and enforced clickwrap agreements. These cases are not persuasive because the contexts in which they arose are unlike the case before us. Plaintiff here was

14

not downloading software from a website, unlike the customers in *Net2Phone, supra*, 109 Cal.App.4th at p. 586.) She was not downloading an application to her phone or computer, or seeking to register for a new online service or set up a new account. (See *Peter v. DoorDash, Inc.* (N.D. Cal. 2020) 445 F.Supp.3d 580, 582, 587 [enforceable agreement to arbitrate formed when consumers signed up for DoorDash accounts by entering information on a sign-up screen and tapping a button above the statement "By tapping Sign Up . . . , you agree to our Terms and Conditions and Privacy Statement" containing hyperlink to Terms and Conditions]; *Meyer v. Uber Technologies, Inc.* (2d Cir. 2017) 868 F.3d 66, 70-71, 80 [enforceable agreement to arbitrate formed when consumer downloaded application, provided information (including payment information) to register for a service and clicked button marked " 'REGISTER' " displayed above text advising that by creating an account consumer was agreeing to terms of service and privacy policy]; *Bassett v. Electronic Arts, Inc.* (E.D.N.Y. 2015) 93 F.Supp.3d 95, 101-102 [enforceable agreement to arbitrate formed when customer clicked button indicating acceptance to Terms of Service and Privacy Policy "in order to create an account and register for" an online service]; *Swift v. Zynga Game Network, Inc.* (N.D. Cal. 2011) 805 F.Supp.2d 904, 910, 912 [enforceable agreement to arbitrate formed when customer clicked "' I Accept' " button, indicating acceptance of hyperlinked terms of service agreement, in order to log on to play an online game].) When she checked in for her massage, plaintiff already had an account with the San Rafael location, as the initial check-in screen confirmed, and she was not informed that she was signing up for a new service with MEF or setting up an account with MEF.

Because we conclude there was no contract, and therefore no binding agreement to arbitrate, between plaintiff and MEF, we need not reach the

15

parties' other arguments on appeal regarding unconscionability, the arbitrability of plaintiff's claims against MEF, and the forum in which arbitrability should be decided.

## DISPOSITION

The order denying Massage Envy's motion to compel arbitration is affirmed. Respondent shall recover her costs on appeal.

_____

Miller. J.

WE CONCUR:

_____

Stewart, P.J.

_____

Richman, J.

A161688, *Doe v. Massage Envy Franchising, LLC*

17

Trial Court:  San Mateo County Superior Court

Trial Judge:  Hon. Marie S. Weiner

Sacks Ricketts & Case, Luanne Sacks, Michele D. Floyd; Greines, Martin, Stein & Richland, Laurie J. Hepler, Jeffrey B. Gurrola, for Defendant and Appellant

Law Offices of Valerie T. McGinty, Valerie T. McGinty; Thompsom Law Offices, Robert W. Thompson, Kristen A. Vierhaus; Laffey, Bucci & Kent, Brian T. Kent, Stewart Ryan, for Plaintiff and Respondent

A161688, *Doe v. Massage Envy Franchising, LLC*